## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **LUIS ALFONSO TORRES HERNANDEZ,** | |
| **Plaintiff,** | |
| **v.** | **Civil No. 1:23-cv-01016-JRR** |
| **JAMES ABRAHAM LLOYD, *et al.*** | |
| **Defendants.** | |

## <u>MEMORANDUM OPINION</u>

This matter comes before the court on Defendant Mayor and City Council of Baltimore's Motion to Dismiss Plaintiff's Second Amended Complaint (ECF No. 35; the "City Motion"), Baltimore Police Department's ("BPD") Motion to Dismiss Plaintiff's Second Amended Complaint (ECF No. 36; the "BPD Motion"), Juan Diaz's Motion to Dismiss Plaintiff's Second Amended Complaint (ECF No. 37; the "Diaz Motion"), Troy Taylor and Manuel Labri's Motion to Dismiss Plaintiff's Second Amended Complaint (ECF No. 38; the "Taylor Motion"), and James Abraham Lloyd's Partial Motion to Dismiss. (ECF No. 39; the "Lloyd Motion").  The parties' submissions have been reviewed and no hearing is necessary.  Local Rule 105.6 (D. Md. 2023).

## I.      BACKGROUND[1]

Plaintiff Luis Alfonso Torres Hernandez is a citizen of the State of Maryland and resides in Montgomery County, Maryland.  (ECF No. 29 ¶ 5; Second Amended Complaint, referred to as "Amended Complaint.")   At all relevant times, Plaintiff worked as a home improvement

---

[1] For purposes of this memorandum, the court accepts as true the well-pled facts set forth in the Second Amended Complaint.  (ECF No. 29.)

contractor.[2]  Defendant BPD is a law enforcement agency in Baltimore City, Maryland.  *Id.* ¶ 6. At all times relevant to the Amended Complaint, the BPD Homicide Unit employed Lloyd as a Sergeant, and Diaz, Taylor, and Larbi as Detectives.  *Id.* ¶¶ 7–10.  (Defendants Diaz, Taylor, Labri, and Lloyd are hereinafter referred to collectively as the "Officer Defendants.")  Defendant Mayor and City Council of Baltimore (the "City") is a municipal corporation and, at all relevant times, employed the Officer Defendants as sworn police officers with the BPD.  *Id.* ¶ 5.

On or around May 2020, Plaintiff was working in Baltimore City on a customer's residence when Lloyd stopped to speak with one of Plaintiff's workers about a patio project at Lloyd's home. (ECF No. 29 ¶ 11.)  Two days later, Plaintiff reached out to Lloyd regarding the project and Lloyd expressed an interest in hiring Plaintiff.  *Id.* ¶ 12.  Plaintiff provided Lloyd with a quote of $7,000; later, Plaintiff completed a stone patio at Lloyd's home.  Upon completion of the patio, Lloyd expressed satisfaction with the work done and praised Plaintiff's professionalism and workmanship.  *Id.* ¶¶ 12-14.  On or around June 18, 2020, Lloyd called Plaintiff to complain about some issues with the patio pavers.  (ECF No. 29 ¶ 15.)  Plaintiff drove to Lloyd's home to inspect the patio; Lloyd's fiancé and Diaz were present.  *Id.* ¶ 16.  Diaz commented to Plaintiff that the patio was not worth $7,000.  *Id.*  Plaintiff agreed to repair the issues and, on request of Lloyd's fiancé, Plaintiff agreed to enlarge the patio at cost.  *Id.*

On June 25, 2020, Lloyd ordered Detectives Taylor, Larbi, and Diaz to be present at his house when Plaintiff arrived.  (ECF No. 29 ¶¶ 17–18.)  At the time, the Officer Defendants "were on duty and acting within the scope of their employment" with the BPD.  *Id.* ¶ 18.  A few days

---

[2]  This is not a fact expressly alleged in the Amended Complaint; rather, reference is made to Plaintiff's residential contracting work.  (*See, e.g.,* Amended Complaint ¶¶ 11–15.)  Plaintiff's motions papers, however, refer to Plaintiff as a "home improvement contractor."  (*See, e.g.,* Opposition to the BPD Motion, ECF No. 47, at 1.)  This fact appears not to be in dispute and is otherwise not legally material; instead, the court employs this fact to present the full context of Plaintiff's claims.

before, Lloyd had directed Larbi to run a criminal and motor vehicle records check on Plaintiff "for the purpose of extorting" him.  *Id.* ¶ 20.  Plaintiff arrived at Lloyd's home on the morning of June 25, 2020, and saw a minivan with dark tinted windows blocking the driveway and his crew's vehicle.  *Id.* ¶ 21.  Taylor and Larbi had traveled to Lloyd's residence in the minivan, a police vehicle owned by Baltimore City.  *Id.* ¶ 22.  Diaz had also driven a Baltimore City police vehicle to Lloyd's home.  *Id.* ¶ 23.  Lloyd was parked behind the minivan in an unmarked Baltimore City police vehicle.  *Id.* ¶ 24.  Upon Plaintiff's arrival, Lloyd exited his vehicle, approached Plaintiff with his firearm visible, and stated: "We have problems. Where is my contract?"  (ECF No. 29 ¶ 24.)  Lloyd and Plaintiff then went to the back of the house and Lloyd asked to see Plaintiff's driver's license.  *Id.* ¶ 26.  When Plaintiff asked why, Lloyd responded by pulling out his law enforcement badge and showing it to Plaintiff .  *Id.*

Taylor ran a search of Plaintiff's driver's license and license plate through law enforcement databases and discovered that Plaintiff's license was suspended.  (ECF No. 29 ¶ 28.)  Taylor provided Lloyd with this information.  *Id.*  Lloyd then informed Plaintiff that his license was suspended and told Plaintiff that he would arrest him unless Plaintiff returned the money Lloyd had paid him.  *Id.* ¶ 29.  Diaz then approached Lloyd and Plaintiff, with his gun and badge visible, and told Plaintiff, "all you have to do is give his money back."  *Id.* ¶ 31.  Lloyd then called Larbi and Taylor, who were waiting in the minivan, and asked them to take Plaintiff downtown because he was driving on a suspended license.  *Id.* ¶ 32.  Lloyd told Plaintiff that they could solve the issue if Plaintiff gave Lloyd his money back for the patio Plaintiff constructed.  *Id.* ¶ 34.  Lloyd then asked Plaintiff what bank he used.  When Plaintiff told him Navy Federal Credit Union, Taylor searched for the nearest location for Lloyd to transport Plaintiff to get his money.  (ECF No. 29 ¶¶ 34–35.)

In fear for his safety, Plaintiff got into Lloyd's police car.  *Id.* ¶ 36.  Before Lloyd began driving to the bank, Plaintiff told Lloyd he did not want any problems.  Lloyd responded, "Problem would be if I take you in the woods."  *Id.*  Lloyd then drove Plaintiff to Navy Federal Credit Union using his police vehicle; along the way, Lloyd stated several times: "You are going to give me my money back and I'm going to give you freedom."  (ECF No. 29 ¶¶ 37–38.)

Plaintiff arrived at the credit union, obtained a cashier's check made payable to Lloyd for $3,500, and gave it to Lloyd.  *Id.* ¶ 39.  (Lloyd later deposited the check.  *Id.* ¶ 40.)  From the credit union, Lloyd drove Plaintiff back to his vehicle at Lloyd's home, but Plaintiff was fearful he would be arrested for driving on a suspended license.  *Id.*  ¶ 41.  Lloyd told Plaintiff he would not be arrested and ordered him to leave.  *Id.*  On June 25, 2020, Plaintiff reported the incident to the police.  (ECF No. 29 ¶ 43.)

Plaintiff alleges that "Lloyd's conduct, including the deprivation of constitutional rights, represents not a single isolated, accidental, or peculiar event, but occurred in the regular procedures followed by the Baltimore Police Department and constitutes a pattern or practice of illegal and unconstitutional conduct."  (ECF No. 29 ¶ 49.)  Plaintiff alleges that, prior to Lloyd's conduct in the instant case, the BPD "had a policy, practice, and custom of sworn police officer using their office police powers to engage in extortion for their own personal benefit."  (ECF No. 29 ¶¶ 55–78.)

On March 2, 2023, Plaintiff filed the instant action in the Circuit Court for Baltimore City. (ECF No. 1.)  On April 17, 2023, the City removed the case to this court.  *Id.*  The Amended Complaint sets forth twelve counts: False Imprisonment against Lloyd (Count I); False Arrest against Lloyd (Count II); Violation of Article 24 of the Maryland Declaration of Rights against the City, BPD, and Lloyd (Count III); Violation of Article 26 of the Maryland Declaration of

Rights against the City, BPD, and Lloyd (Count IV); Civil Conspiracy against all Defendants (Count V); Aiding and Abetting against Diaz, Taylor, and Larbi (Count VI); Intentional Infliction of Emotional Distress against Lloyd (Count VII); Conversion against Lloyd (Count VIII); Violation of 42 U.S.C. § 1983 against Lloyd in his individual capacity (Count IX); Violation of 42 U.S.C. § 1983 against the City, BPD, and Lloyd in his official capacity (Count X); Violation of Article 24 of the Maryland Declaration of Rights against the City and BPD – Failure to Supervise (Count XI); and Violation of Article 26 of the Maryland Declaration of Rights against the City and BPD – Failure to Supervise (Count XII).

Through the several motions identified in the introductory paragraph, Defendants move to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (ECF Nos. 35 through 39.)

## II.    LEGAL STANDARDS

### Federal Rule of Civil Procedure 12(b)(1)

BPD asserts that the court lacks subject matter jurisdiction over the state and common law claims—Counts III, IV, V, XI, and XII—because they are barred by operation of state sovereign immunity.  (ECF No. 36-1 at 3.)[3]  Lloyd argues that state sovereign immunity bars Plaintiff's state law official capacity claims in Counts I through V, VII, and VIII. (ECF No. 39 at 5.)

"Rule 12(b)(1) of the Federal Rules of Civil Procedure authorizes dismissal for lack of subject matter jurisdiction." *Barnett v. United States*, 193 F. Supp. 3d 515, 518 (D. Md. 2016). "The plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction." *Mayor & City Council of Balt. v. Trump*, 416 F. Supp. 3d 452, 479 (D. Md. 2019).  Subject matter jurisdiction challenges may proceed in two ways: a facial challenge or a

---

[3] Throughout this memorandum opinion, citation to document page numbers refer to the page number within the original source, not pagination assigned by the ECF system.

factual challenge. *Id.* A facial challenge asserts "that the allegations pleaded in the complaint are insufficient to establish subject matter jurisdiction." *Id.* A factual challenge asserts "that the jurisdictional allegations of the complaint [are] not true." *Id.* (quoting *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009)). "In a facial challenge, 'the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction.'" *Trump*, 416 F. Supp. 3d at 479 (quoting *Kerns*, 585 F.3d at 192 (instructing that in a facial challenge to subject matter jurisdiction the plaintiff enjoys "the same procedural protection as . . . under a Rule 12(b)(6) consideration.")). "[I]n a factual challenge, 'the district court is entitled to decide disputed issues of fact with respect to subject matter jurisdiction.'" *Id.*

BPD and Lloyd raise facial challenges to the court's subject matter jurisdiction, asserting that the doctrine of sovereign immunity bars specific counts in the Amended Complaint. The defense of sovereign immunity is a jurisdictional bar because "sovereign immunity deprives federal courts of jurisdiction to hear claims, and a court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject-matter jurisdiction." *Cunningham v. Gen. Dynamics Info. Tech.*, 888 F.3d 640, 649 (4th Cir. 2018) (quoting *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 207 (5th Cir. 2009)). Because sovereign immunity is akin to an affirmative defense, a defendant bears the burden of demonstrating that sovereign immunity exists. *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014).

### Federal Rule of Civil Procedure 12(b)(6)

A Rule 12(b)(6) motion "tests the legal sufficiency of a complaint. It does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)). Accordingly, a "Rule 12(b)(6) motion should only be granted

if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards*, 178 F.3d at 244 (*citing Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)).

"While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). "A complaint that provides no more than 'labels and conclusions,' or 'formulaic recitation of the elements of a cause of action,' is insufficient." *Bourgeois v. Live Nation Ent., Inc.*, 3 F. Supp. 3d 423, 434 (D. Md. 2014) (quoting *Twombly*, 550 U.S. at 555). "The [c]ourt must be able to deduce 'more than the mere possibility of misconduct'; the facts of the complaint, accepted as true, must demonstrate that the plaintiff is entitled to relief." *Evans v. 7520 Surratts Rd. Operations, LLC*, No. PX-21-1637, 2021 U.S. Dist. LEXIS 221041, at *4 (D. Md. Nov. 16, 2021) (quoting *Ruffin v. Lockheed Martin Corp.*, 126 F. Supp. 3d 521, 526 (D. Md. 2015)).

## III.    ANALYSIS

### A.    <u>State Sovereign Immunity</u>

#### 1.    BPD

BPD asserts, and Plaintiff does not dispute, that the court lacks subject matter jurisdiction over the state and common law claims—Counts III, IV, V, XI, and XII—because they are barred by the doctrine of state sovereign immunity.  (ECF No. 36-1 at 3; ECF No. 47 at 9.)

"[A]lthough the BPD is not immune from suit under Section 1983 pursuant to the Eleventh Amendment, 'with respect to state law causes of action, the result is different.'" *Corbitt v. Balt. City Police Dep't*, No. RDB-20-3431, 2021 U.S. Dist. LEXIS 149996, at *21 (D. Md. Aug. 10, 2021) (quoting *Chin v. City of Balt.*, 241 F. Supp. 2d 546, 548 (D. Md. 2003)). "State sovereign immunity protects the State not only from damages actions for ordinary torts but also from such actions for State constitutional torts." *Id.* (quoting *Chin*, 241 F. Supp. 2d at 548). "Unless the Maryland General Assembly has waived State sovereign immunity, the doctrine bars an individual plaintiff from maintaining a suit for money damages against the State of Maryland or one of its agencies for violations of State law." *Id.* at 22. "The sole waiver of immunity provision in the [Local Government Tort Claims Act] is the waiver of the 'governmental or sovereign immunity to avoid the duty to defend or indemnify an employee." *Balt. Police Dep't v. Cherkes*, 140 Md. App. 282, 323 (2001).

State sovereign immunity is applicable to state agencies and instrumentalities. *Corbitt*, 2021 U.S. Dist. LEXIS 149996, at *21. "Maryland law defines the BPD as a State agency." *Id.* at *22. It is well-established that "BPD 'enjoys sovereign immunity from actions for damages based on state common law torts or state constitutional torts.'" *Bumgardner v. Taylor*, No. RDB-18-1438, 2019 U.S. Dist. LEXIS 53759, at *16–17 (D. Md. Mar. 28, 2019) (citing *Chin*, 241 F. Supp. 2d at 547–48)).

Accordingly, the BPD Motion as to Counts III, IV, V, XI, and XII will be granted.

### 2.    Lloyd "in his Official Capacity"

Lloyd argues that state sovereign immunity bars Plaintiff's state law "official capacity" claims in Counts I through V, VII, and VIII.  (ECF No. 39 at 5.)  But the premise of this argument exists neither in the factual allegations of the Amended Complaint nor at law.  Although such a

distinction is material in non-state law claims (*i.e.*, Section 1983),[4] there is no distinction between individual and official capacities with regard to state common law or state constitutional claims as a matter of Maryland law; and, in any event, these counts articulate no "capacity" within which Plaintiff sues Lloyd.[5]  *Ritchie v. Donnelly*, 324 Md. 344, 375 (1991); *see Higginbotham v. Pub. Serv. Comm'n of Md.*, 412 Md. 112, 130 (2009) (noting that in the context of "intentional tort actions asserted against Maryland public officials . . . . it is of no consequence whether the Maryland public official is sued in his or her 'official' capacity or 'individual' capacity"); *Shriner v. City of Annapolis*,  No. CIV.A. ELH-11-2633, 2012 WL 2317415, at *3 (D. Md. June 15, 2012) ("[T]he Maryland Court of Appeals has made clear that the individual/official capacity dichotomy is not relevant to claims under Maryland state law" and therefore, "[i]t is not meaningful under Maryland law to divide claims according to individual capacity and official capacity"); *Hart v. Evans*, No. CV DKC 2006-1180, 2007 WL 9782483, at *5 n.5 (D. Md. Jan. 16, 2007) ("Maryland common law claims, however, do not distinguish between individual capacity and official capacity claims.").  Accordingly, the Lloyd Motion as to Counts I through V, VII, and VIII will be denied on this basis.[6]

## B.    The City's Motion (ECF No. 35)

Plaintiff alleges that the City is liable because it "employed the individual defendants as sworn police officers with the Baltimore City Police Department."  (ECF No. 29 ¶ 5.)  The City

---

[4] As discussed in more detail below, *see* Section III.C., *infra*, under 42 U.S.C. § 1983, a plaintiff may assert an action against individual officers in their official and individual capacities.  *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (explaining that in the context of Section 1983, "[o]fficial-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" (quoting *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, n.55 (1978)).

[5] Lloyd does not dispute that Maryland law expressly holds that there is no distinction.  Nonetheless, Lloyd urges that "pleading claims in both capacities is unnecessary, and therefore, warrants dismissal of the official capacity aspect." (ECF No. 52 at 12–13.)

[6] As explained below, the Lloyd Motion will be granted as to Counts V and VIII on a separate basis.  *See* Sections III.D.1 and III.D.4, *infra*.

argues that the Amended Complaint is subject to dismissal because, as a matter of law, the City does not control the BPD or its employees.  (ECF No. 35-1 at 8.)  Plaintiff concedes this point and, in his Response, voluntarily dismisses the City as a Defendant.  (ECF No. 48.)  In its Reply, the City argues that Plaintiff's claims against it should be dismissed with prejudice and without leave to amend.  (ECF No. 55 at 6.)

In *Chin v. City of Baltimore*, the court held "that Baltimore City, as an entity distinct from the Baltimore Police Department under Maryland law, cannot be liable for the actions of an employee of the Baltimore Police Department."  241 F. Supp. 2d 546, 549 (D. Md. 2003). Specifically, the *Chin* court explained:

> . . . as a matter of Maryland law, the Baltimore City government does not wield enough control over the Baltimore Police Department to be subject to liability for the Baltimore Police Department's actions. In *Clea*, the Maryland Court of Appeals held that Baltimore City could not be liable in a state law tort action for the acts of a Baltimore Police Department Officer under a *respondeat superior* theory, because an officer of the Baltimore Police Department is not an employee of Baltimore City. *Clea*, 541 A.2d at 1306. Judge Harvey, following *Clea*, determined that Baltimore City cannot be held liable under § 1983 for an unconstitutional arrest by a Baltimore City police officer. *Carter v. Mayor and City Council of Baltimore*, 164 F. Supp. 2d 509, 517–18 (D. Md. 2001) (vacated on other grounds at 39 Fed. Appx. 930, 2002 WL 1580679 (4th Cir.2002)). The court sees no reason to depart from *Clea* and *Carter*.

241 F. Supp. 2d 546, 549 (D. Md. 2003); *see Estate of Anderson v. Strohman*, 6 F. Supp. 3d 639, 644 (D. Md. 2014) (noting that this court "has repeatedly concluded the City does sufficiently control the BPD to be responsible for Baltimore police officer conduct under § 1983 (*i.e.*, they are not City employees").  Thus, the *Chin* court dismissed the state law counts and the § 1983 claim as against the defendant Baltimore City.  *Chin*, 241 F. Supp. 2d at 549–50.

For these same reasons, the City's Motion will be granted and Plaintiff's state law claims (Counts III through V, XI and XII) and § 1983 claim (Count X) asserted against the City will be dismissed with prejudice.  *See Estate of Anderson*, 6 F. Supp. 3d at 645 (dismissing § 1983 claim against the defendant Mayor and City Council of Baltimore City with prejudice and denying leave to amend "[b]ecause the City cannot be liable for the alleged offenses, and Plaintiffs offer no specific factual allegations that would cure that defect . . .").

**C.**    **42 U.S.C. § 1983 (Counts IX and X)**

**1.**    ***Monell* Claim against BPD (Count X)**

In Count X, Plaintiff asserts a *Monell*[7] claim against BPD based on "a pattern and practice of unjustified, unreasonable, and illegal theft and extortion by police officers" and a failure to properly train and supervise.[8]  (ECF No. 29 ¶¶ 147–155.)

> 42 U.S.C. § 1983 provides:
>
>> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . ."

42 U.S.C. § 1983.  Section 1983 does not, standing alone, provide substantive rights; rather, it is "a method for vindicating federal rights elsewhere conferred."  *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979).  To state a claim under § 1983, Plaintiffs "must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged

---

[7] As discussed more fully below, in *Monell v. Department of Social Services*, the Supreme Court explained that "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  436 U.S. 658, 694 (1978).

[8] The *Monell* claim is also asserted against the City.  As discussed above, however, all counts against the City are dismissed.  *See* Section III.B, *supra*.

deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988) (citations omitted).

In *Monell v. Department of Social Services*, the Supreme Court concluded that Congress intended "municipalities and other local government units to be included among those persons to whom § 1983 applies." 436 U.S. 658, 690 (1978). The Court further explained that "[l]ocal governing bodies [] can be sued directly under § 1983 for monetary, declaratory, or injunctive relief, where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* A state agency, however, cannot be sued under § 1983 because a state agency is not a "person" under 42 U.S.C. § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 67 (1989).

In *Chin v. City of Baltimore*, the court held that BPD is subject to suit for violation of § 1983 because it "is too interconnected with the government of the City" to constitute a state agency. 241 F. Supp. 2d 546, 548 (D. Md. 2003). This court has repeatedly affirmed this principle. *See, e.g.*, *Nicholson v. Balt. Police Dep't*, No. DKC-20-3146, 2021 U.S. Dist. LEXIS 75798, at *16 (D. Md. Apr. 20, 2021) (holding that "the BPD, while a state entity under Maryland law, is considered a municipal entity subject to suit for purposes of § 1983"); *Fish v. Mayor of Balt.*, CCB-17-1438, 2018 U.S. Dist. LEXIS 4222, at *9 (D. Md. Jan. 10, 2018) (holding that "BPD is not entitled to Eleventh Amendment immunity and, as a result, is a 'person' subject to suit under § 1983"). Accordingly, for purposes of a § 1983 action, BPD is a local government entity.

In order to state a § 1983 *Monell* claim against a municipality, Plaintiff must ". . . adequately plead . . . the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994); *see also Carter v. Morris*, 164 F.3d 215, 218 (4th Cir.

1999) (". . . it is by now well settled that a municipality is only liable under section 1983 if it causes such a deprivation through an official policy or custom"). However, "a municipality cannot be held liable . . . under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691. Municipal liability attaches only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* at 694.

"[A] plaintiff seeking to impose liability on a municipality under § 1983" is required "to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Bd. of Comm'rs of Bryan Cty., v. Brown*, 520 U.S. 397, 403 (1997). A plaintiff may allege four types of policies, customs, or practices for which a municipality may be held liable:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifest[s] deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.[9]

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter*, 164 F.3d at 217).[10] In Count X Plaintiff alleges that BPD is liable under the third and fourth theories.

### a.    *Condonation Theory*

Under a theory of "custom by condonation," a municipality violates § 1983 if "municipal policy makers fail to put a stop to or correct a widespread pattern of unconstitutional conduct." *Owens v. Balt. City State's Attys. Office,* 767 F.3d 379, 402 (4th Cir. 2014) (quoting *Spell v.*

---

[9] As discussed in more detail below, the fourth type is commonly referred to as a "condonation theory" of liability.
[10] BPD argues that Plaintiff fails to satisfy the first theory of liability because Plaintiff does not allege that a BPD official with final policymaking authority established an official policy. (ECF No. 36-1 at 15.) In Response, Plaintiff clarifies that his *Monell* claim is based on "(1) widespread unconstitutional practices that constitute a custom and usage, and (2) deficient training and supervision." (ECF No. 47 at 9.)

*McDaniel,* 824 F.2d 1380, 1389–90 (4th Cir. 1987)) (internal quotation marks omitted); *see also Monell*, 436 U.S. at 690–91 (holding that "'[o]fficial policy' is not the only basis for imposing municipal liability. 'Custom, or usage,' in the exact language of § 1983, may also serve.   And the existence of such a 'custom or usage' may be found in 'persistent and widespread . . . practices of [municipal] officials [which] although not authorized by written law, [are] so permanent and well-settled as to [have] the force of law'") (citing and quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68 (1970)).

To state a *Monell* claim based on a condonation theory, "[a] plaintiff must point to a persistent and widespread practice[] of municipal officials, the duration and frequency of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their deliberate indifference." *Owens*, 767 F.3d at 402 (citation omitted). "Both knowledge and indifference can be inferred from the 'extent' of employees' misconduct." *Id.* at 402–403 (quoting *Spell*, 824 F.2d at 1391). "Sporadic or isolated violations of rights will not give rise to *Monell* liability; only 'widespread or flagrant' violations will." *Id.* at 403 (quoting *Spell*, 824 F.2d at 1387). Further, a policy or custom that gives rise to § 1983 liability will not "be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees." *Milligan v. Newport News*, 743 F.2d 227, 230 (4th Cir. 1984). "Only when a municipality's conduct demonstrates a 'deliberate indifference' to the rights of its inhabitants can the conduct be properly thought as a 'policy or custom' actionable under § 1983." *Nicholson v. Balt. Police Dep't*, No. DKC 20-3146, 2021 U.S. Dist. LEXIS 75798, at *22 (D. Md. Apr. 20, 2021) (quoting *Jones v. Wellham*, 104 F.3d 620, 626 (4th Cir. 1997)).

BPD argues that Plaintiff's allegations suggesting that the incident was indicative of BPD officers' history of prior unconstitutional conduct are conclusory.   (ECF No. 36-1 at 16.)

Moreover, BPD contends that Plaintiff fails to provide an example of another interaction between a BPD officer and a private citizen involving a private contract dispute. *Id.*

"Although prevailing on the merits of a *Monell* claim is difficult, simply alleging such a claim is, by definition, easier." *Owens v. Balt. City State's Atty's. Off.*, 767 F.3d 379, 403 (4th Cir. 2014). And to prevail on a *Monell* claim, a plaintiff must provide "numerous particular instances of unconstitutional conduct in order to establish a custom or practice." *Lytle*, 326 F.3d at 468 (affirming summary judgment because deprivation of rights was not caused by a municipal policy or custom); *see also Carter*, 164 F.3d at 220 (affirming summary judgment). Often, however, at this stage, "a plaintiff lacks specific details regarding the municipal actor's internal policies and training procedures before discovery" and "courts should not expect the plaintiff to possess a rich set of facts concerning the allegedly unconstitutional policy and the responsible policymakers[.]" *Saltz v. City of Frederick, Md.*, 538 F. Supp. 3d 510, 556–57 (D. Md. 2021). "To survive a motion to dismiss under Rule 12(b)(6), a plaintiff need only support his condonation claim with facts which, if true, 'state a claim to relief that is plausible on its face.'" *Jones v. Jordan*, No. GLR-16-2662, 2017 U.S. Dist. LEXIS 150701, at *21–22 (D. Md. Sept. 18, 2017) (quoting *Owens*, 767 F.3d at 403 that "simply alleging" a *Monell* claim is easier than prevailing on the merits).

*Monell* claims survive the motion to dismiss stage if the plaintiff alleges facts to support that the defendant "was aware of ongoing constitutional violations" and "did nothing to stop or correct those actions." *Smith v. Aita*, No. CCB-14-3487, 2016 U.S. Dist. LEXIS 90029, at *13 (D. Md. July 12, 2016); *see Garcia v. Montgomery Cnty.*, No. JFM-12-3592, 2013 U.S. Dist. LEXIS 120659, at *14–15 (D. Md. Aug. 23, 2013) (denying motion to dismiss on the basis that the plaintiff alleged that the defendant "was aware of the ongoing constitutional violations by MCPD officers and that the county's failure to supervise and discipline its officers allowed a pattern and/or

practice of unconstitutional actions to develop"); *McDowell v. Grimes*, No. GLR-17-3200, 2018 U.S. Dist. LEXIS 133289, at *15 (D. Md. Aug. 7, 2018) (denying motion to dismiss because the plaintiff alleged sufficient facts that the defendant "had knowledge of, and was deliberately indifferent to, officers' practice of unconstitutional conduct"); *Jones*, 2017 U.S. Dist. LEXIS 150701, at *26 (denying motion to dismiss on the basis that the facts were sufficient to plead that the defendant was aware of police officers' ongoing violations).

In *Garcia v. Montgomery County*, the court disagreed with the "defendants' assertion that [the plaintiff's] complaint mentions only his incident and that he has pled nothing more than an isolated deprivation," and, instead, found the plaintiff had adequately stated a claim because the complaint alleged that the defendant "was aware of unconstitutional actions by MCPD officers directed towards members of the media but chose to ignore such behavior." 2013 U.S. Dist. LEXIS 120659, at *14.   Accordingly, a plaintiff is not required to "plead the multiple incidents of constitutional violations that may be necessary at later stages to establish the existence of an official policy or custom and causation." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 339–40 (4th Cir. 1994).   In contrast, in *Corbitt v. Baltimore City Police Department*, the court granted the defendant's motion to dismiss a *Monell* claim because the plaintiff asserted "absolutely no facts to support his contention that the BPD . . . condoned the activity of BPD Officers." 2021 U.S. Dist. LEXIS 149996, at *20.   In addition, the *Corbitt* court reasoned that there were no allegations as to whether there had been similar incidents or whether BPD and/or its officers were aware of the alleged improper conduct. *Id.*

In the instant case, Plaintiff alleges that BPD "had a policy, practice, and custom of police officers using their police powers using the power of coercion to extract benefits and engage extortion and outright thefts from members of the public." (ECF No. 29 ¶ 55.)  Plaintiff provides

numerous instances—beginning in May 2011 through August 2016—where Baltimore City Police

Officers, while on duty, extracted benefits and engaged in extortion and outright thefts from the

public.[11]  *Id.* ¶¶ 55–78.  Plaintiff further alleges:

> It is further believed and alleged that this pattern or practice of constitutional violations committed by Baltimore City police officers and the impunity with which these officers were able to act was known by Defendant Lloyd and others. It is further believed and alleged that Defendant Lloyd was aware that there were no restrictions in place - despite the criminal acts perpetrated by other police officers in the years preceding these events – to alert any supervisor or prevent Lloyd from instructing his subordinates to show up at his office to intimate Plaintiff and extort money from him. It is further believed and alleged that the culture in the Department and the power conferred by the Department on Defendant Lloyd did not lead Defendant Diaz, Taylor, or Larbi to object to his conduct towards Plaintiff or lead any of these officers to intervene and stop Defendant Lloyd while he was engaging in this criminal conduct or even report Defendant Lloyd after he committed these criminal acts against Plaintiff. It is further believed and alleged that Defendant Lloyd and others knew that the Department failed to implement meaningful measures to prevent the reoccurrence these type of civil rights violations by officers against members of the public.

*Id.* ¶ 88.

In its Reply, BPD directs the court's attention to *McMahon v. County Com'rs of Kent*

*County.*  (ECF No. 56 at 6-7; citing 2013 WL 2285378 (D. Md. May 21, 2013)).  In doing so, BPD

argues that the *Monell* claim is subject to dismissal because, like the plaintiff in *McMahon*, Plaintiff

"has neither plead the existence of an unconstitutional municipal policy nor has he sufficiently, if

at all, identified any other specific incidents of similar unconstitutional conduct[.]"  *Id.* at 7.

---

[11] BPD argues that the court should not consider Plaintiff's allegations regarding the Department of Justice ("DOJ") Report because those allegations "are limited exclusively to conclusory statements about the DOJ's conclusions and findings."  (ECF No. 36-1 at 16-18.)  At this stage, the court may properly consider Plaintiff's "allegations that rely on the DOJ report and accept them as true, to the extent that they are factual assertion."  *Jones v. Jordan*, No. CV GLR-16-2662, 2017 WL 4122795, at *6 (D. Md. Sept. 18, 2017).  That notwithstanding, even were the court not to consider Plaintiff's allegations regarding the DOJ Report, the *Monell* claim survives.

Moreover, BPD asserts that the reforms implemented as part of the BPD Consent Decree[12] preclude a finding that Plaintiff sufficiently pled deliberate indifference.  *Id.* at 13.

BPD's reliance on *McMahon* is misplaced.  There, in concluding that the plaintiff failed to state a plausible *Monell* claim, the court reasoned that "where the plaintiff alleges neither the existence of a policy nor specific incidents of similar conduct, the complaint does not support a plausible and reasonable inference that municipal policy or custom caused the plaintiff's constitutional deprivations."  *McMahon v. Cnty. Comm'rs of Kent Cnty.*, No. CIV. JFM-13-490, 2013 WL 2285378, at *4 (D. Md. May 21, 2013).  The *McMahon* court came to this conclusion because the plaintiff provided "isolated incidents," failed to allege that the officer acted pursuant to some policy or custom, and failed to allege other instances in which the officer made a similar decision.  *Id.* at *4.  Rather, the plaintiff's allegations pertained to one specific date and the plaintiff failed to allege an existence of any municipal custom or policy.  *Id.*

In distinguishing the case with the Fourth Circuit case *Jordan v. Jackson*,[13] the *McMahon* court explained:

> In *Jordan v. Jackson*, the Fourth Circuit stated that a plaintiff need
> not "plead multiple instances of similar constitutional violations to
> support an allegation of municipal policy or custom." *Jordan*, 15
> F.3d at 339. "There is no requirement that he detail the facts
> underlying his claims, or that he plead the multiple incidents of
> constitutional violations that may be necessary at later stages to
> establish the existence of an official policy or custom and
> causation." *Id.* In *Jordan*, however, the plaintiff had alleged "the
> existence of several municipal policies or customs." *Id.* at 340.
> McMahon, by contrast, never alleges the existence of any municipal
> policy. *Jordan* therefore stands for the proposition that a plaintiff
> who alleges the existence of a municipal policy or custom need not
> substantiate that allegation by pleading other specific incidents of
> similar constitutional violations. But where the plaintiff alleges

---

[12] In January 2017, the BPD and the DOJ jointly requested to enter into a Consent Decree "to ensure that the agreed-upon comprehensive measures to reform BPD are implemented fully and faithfully."  (ECF No. 36-1 at 23; citing *United States v. Balt. City Police Dep't*, No. 1:17-cv-00099-JKB (D. Md. Jan. 12, 2017)).

[13] 15 F.3d 333 (4th Cir. 1994).

neither the existence of a policy nor specific incidents of similar conduct, the complaint does not support a plausible and reasonable inference that municipal policy or custom caused the plaintiff's constitutional deprivations. *See Flanagan v. Anne Arundel Cnty.*, 593 F. Supp. 2d 803, 810 (D. Md. 2009) ("Plaintiffs must plead a County policy or custom that proximately causes the harm. By failing to state any policy whatsoever, no causal inference may be drawn to support plaintiffs' claims." (internal citations omitted)). McMahon therefore has not alleged a plausible *Monell* claim.

2013 WL 2285378, at *4.

While BPD maintains that Plaintiff fails to allege a policy or custom, BPD fails to consider that a "[p]olicy or custom may be inferred from 'continued inaction in the face of a known history of widespread constitutional deprivations on the part of [municipal] employees[.]'" *Id.* at *3 (quoting *Milligan v. City of Newport News*, 743 F.2d 227, 229–30 (4th Cir. 1984)).  In contrast to *McMahon*, Plaintiff alleges that the Officer Defendants acted pursuant to a BPD policy or custom. (ECF No. 29 ¶ 88.)  Plaintiff need not provide specific instances where the Officer Defendants made a similar decision.  *See Jordan*, 15 F.3d at 339 ("There is no requirement that he detail the facts underlying his claims, or that he plead the multiple incidents of constitutional violations that may be necessary at later stages to establish the existence of an official policy or custom and causation.").  At this stage, Plaintiff sufficiently alleges fact to suggest that BPD was aware of the alleged pattern and practice of BPD officers engaging in civil rights violations, and that BPD failed to implement measures to stop those actions.  *See Jordan by Jordan*, 15 F.3d at 338 (noting that "section 1983 claims are not subject to a 'heightened pleading standard' paralleling the rigors of proof demanded on the merits").  The Amended Complaint contains specific allegations involving incidents with other BPD officers; Plaintiff also alleges BPD's awareness of the officers' alleged unconstitutional conduct.  Together, these allegations are sufficient to survive a motion to dismiss.

The court appreciates that Plaintiff "must also plausibly allege that the condoned policy or custom has an affirmative causal link to their particular constitutional violation." *Johnson v. Baltimore Police Dep't*, 452 F. Supp. 3d 283, 311 (D. Md. 2020). In *Johnson*, the court explained:

> This causal link is satisfied "if occurrence of the specific violation [alleged] was made reasonably probable by permitted continuation of the custom," such that the specific violation was "almost bound to happen, sooner or later, rather than merely likely to happen in the long run." *Id.* (internal quotations omitted); *see also, e.g., Carter*, 164 F.3d at 218 (quoting *Spell*, 824 F.2d at 1390).
>
> As the Fourth Circuit has recognized, however, at the pleading stage, "[t]here is no requirement that" the plaintiff "plead the multiple incidents of constitutional violations that may be necessary at later stages to establish . . . causation." *Jordan by Jordan*, 15 F.3d at 339. Indeed, in holding that only the notice pleading requirements of Federal Rule of Civil Procedure 8 applied to *Monell* claims, the Supreme Court stated, "federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims." *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168-69, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); *accord Jordan by Jordan*, 15 F.3d at 340. Courts in this District have heeded this call, and held that a plaintiff need only allege that the municipality "was aware of ongoing constitutional violations," and that this awareness allowed the custom of unconstitutional practices to continue developing. *Garcia v. Montgomery County*, No. JFM-12-3592, 2013 WL 4539394, at *5 (D. Md. Aug. 23, 2013); *see also, e.g., McDowell*, 2018 WL 3756727, at *6; *J.A. v. Miranda*, No. PX-16-3953, 2017 WL 3840026, at *7 (D. Md. Sept. 1, 2017).

452 F. Supp. 3d 283, 311 (D. Md. 2020).

At this stage, construed in the light most favorable to Plaintiff (and taken as true), the Amended Complaint plausibly alleges that BPD officers used "their officer police powers to engage in extortion for their own benefit" and that the Officer Defendants here had knowledge of such tactics. (ECF No. 29 ¶¶ 55-78, 88.) And BPD's failure "to implement meaningful measures to prevent" misconduct by BPD officers, is plausibly a proximate cause of Plaintiff's injuries. Moreover, the court acknowledges that BPD entered into a Consent Decree after the alleged

actions in 2011 through 2016; however, in the Amended Complaint, Plaintiff alleges that "Despite DOJ's extensive documentation of this pattern and practice of behavior and ensuing publicity and a DOJ consent decree, this pattern and practice of behavior continued, and remained in existence on June 25, 2020 . . . ." (ECF No. 29 ¶ 52.)  Thus, the timing and "whether the BPD's condoned policy or custom is too attenuated from the particular harm [Plaintiff] suffered requires the development of a factual record through discovery." *Johnson v. Balt. Police Dep't*, 452 F. Supp. 3d 283, 311 (D. Md. 2020).

At this stage, the court is satisfied that Plaintiff plausibly alleges a *Monell* claim under a theory of condonation against BPD and the court will deny the BPD Motion as to Count X for that purpose.

### b.      Failure to Train / Supervise

"A municipality can also be liable for an established policy through a failure to train, if it reflects a deliberate or conscious choice to not do so." *Johnson v. Balt. Police Dep't*, 452 F. Supp. 3d 283, 309 (D. Md. 2020) (citing *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)).  "Training policy deficiencies can include (1) 'express authorizations of unconstitutional conduct,' (2) 'tacit authorizations' of such unconstitutional conduct, and (3) failures to adequately 'prohibit or discourage readily foreseeable conduct in light of known exigencies of police duty.'" *Id.* (quoting *Spell v. McDaniel,* 824 F.2d 1380, 1390 (4th Cir. 1987)).

BPD argues that Plaintiff's failure to train claim fails because while Plaintiff alleges various deficiencies in BPD's training, there are no allegations that the Officer Defendants in this case specifically lacked training "as it related to this incident." (ECF No. 36-1 at 21.)  Therefore, BPD contends, Plaintiff cannot show how the alleged training caused the conduct of the Officer Defendants in this case.  *Id.*

"To state a claim under Section 1983 based on a failure to train, a plaintiff must allege (1) the nature of the training, (2) that the training was a deliberate and conscious choice by the municipality, and (3) that the officer's conduct resulted from said training." *Corbitt v. Balt. City Police Dep't*, No. RDB-20-3431, 2021 U.S. Dist. LEXIS 149996, at *19 (D. Md. Aug. 10, 2021) (internal quotations omitted).  In *McDowell v. Grimes*, the court instructed:

> The nature of the training element requires more than bald assertions that police officers were not properly trained. It is not sufficient to state in broad, conclusory terms and in a variety of different ways that the police department failed to train and supervise its officers. Nor is alleging a general laxness or ineffectiveness sufficient to state a claim. Instead, a plaintiff must allege a specific deficiency with the training.

No. GLR-17-3200, 2018 U.S. Dist. LEXIS 133289, at *10 (D. Md. Aug. 7, 2018) (internal citations omitted); *see Johnson*, 452 F. Supp. 3d at 309 ("No matter which theory is alleged, the plaintiff must point out 'a specific deficiency' in training, 'rather than general laxness or ineffectiveness in training.'") (quoting *Spell*, 824 F.2d at 1390)); *Davis v. Lilly*, No. 7:23-CV-152, 2023 WL 6565288, at *7 (W.D. Va. Oct. 10, 2023) ("[E]ven at the pleading stage, a plaintiff seeking to impose liability on a failure to train theory cannot rely on legal conclusions and speculations, but must allege at least some facts revealing: (1) the nature of the training, (2) that the training was a 'deliberate or conscious' choice by the municipality, and (3) that the officer's conduct resulted from said training.") (citation omitted).  "[T]he municipality will only be liable if 'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'" *Johnson*, 452 F. Supp. 3d at 309 (quoting *Harris*, 489 U.S. at 390).

Here, Plaintiff alleges:

As the Department of Justice Investigative Report recognized, "[t]his pattern or practice is driven by systemic deficiencies in BPD's policies, training, supervision, and accountability structures that fail to equip officers with the tools they need to police effectively and within the bounds of the federal law."

…

Moreover, Defendant Mayor and City Council of Baltimore and the Baltimore Police Department failed to properly train, prosecute, supervise, and discipline its police officers, including, but not limited to, Defendant Lloyd, in the proper constitutional use of his police powers.

Defendant Mayor and City Council of Baltimore and the Baltimore Police Department also failed to properly train and supervise its police officers, including, but not limited to, Defendant Lloyd.

The failure to properly train, prosecute, supervise, and discipline its officers demonstrates a gross disregard for the constitutional rights of the public and the Plaintiff, and was a proximate cause of the Plaintiff's injuries.

(ECF No. 20 ¶¶ 51, 151–53.)

Plaintiff offers no more than bald assertions that the BPD officers were not properly trained. *See McDowell*, *supra*. Plaintiff does not identify what about the officers' training was lacking; nor does Plaintiff allege any factual details about a training program. *McDowell*, *supra*. Indeed, "Plaintiff offers no additional allegations concerning the 'nature of training' or the manner in which 'that the officer's conduct resulted from said training.'" *Corbitt*, 2022 WL 846209, at *8 (quoting *Lewis v. Simms*, No. AW-11-CV-2172, 2012 WL 254024, at *1 (D. Md. Jan. 26, 2012), *aff'd*, 582 F. App'x 180 (4th Cir. 2014) and citing *Hall v. Fabrizio*, JKB-12-754, 2012 WL 2905293, at *2 (D. Md. July 13, 2012) (dismissing failure to train claim against BPD because "the complaint [did] not allege any facts regarding the sort of training that Baltimore police officers actually receive or how that training reflects the decision of any municipal policymaker.")). Accordingly, to the extent Plaintiff's 42 U.S.C. § 1983 *Monell* claim against BPD is premised on

its failure to train officers, Plaintiff has not adequately alleged a *Monell* failure to train claim.  The court will grant the BPD Motion as to Count X for that purpose.

### c.        *Supervisory Liability[14]*

"Even in the absence of an unconstitutional policy or custom, a supervisor's 'continued inaction in the face of documented widespread abuses . . . provides an independent basis' for liability against a supervising official in his personal capacity for deliberate indifference or acquiescence 'in the constitutionally offensive conduct of his subordinates.'" *Jones v. Chapman*, No. CIV.A. ELH-14-2627, 2015 WL 4509871, at *21 (D. Md. July 24, 2015) (quoting *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984)).  To maintain a supervisory liability claim under 42 U.S.C. § 1983, Plaintiff must allege: "(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff."  *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

While Plaintiff alleges that Diaz, Taylor, and Larbi were under Lloyd's supervision, (ECF No. 20 ¶ 18), Plaintiff does not allege any of the required elements to maintain a supervisor liability claim.  Rather, Plaintiff alleges:

> Moreover, Defendant Mayor and City Council of Baltimore and the Baltimore Police Department failed to properly train, prosecute, supervise, and discipline its police officers, including, but not limited to, Defendant Lloyd, in the proper constitutional use of his police powers.

---

[14] It is unclear to the court whether Plaintiff intends to assert a supervisory liability claim under § 1983; however, because the parties brief the issue, the court will address it.

> Defendant Mayor and City Council of Baltimore and the Baltimore
> Police Department also failed to properly train and supervise its
> police officers, including, but not limited to, Defendant Lloyd.
>
> The failure to properly train, prosecute, supervise, and discipline its
> officers demonstrates a gross disregard for the constitutional rights
> of the public and the Plaintiff, and was a proximate cause of the
> Plaintiff's injuries.

(ECF No. 29 ¶¶ 151–53.)

These allegations are insufficient to state a § 1983 supervisory liability claim.  Accordingly, the BPD Motion will be granted to the extent Plaintiff alleges a supervisor liability claim under 42 U.S.C. § 1983.

### 2.      *Monell* Claim against Lloyd in his Official Capacity (Count X)

To the extent Count X asserts a § 1983 claim against Lloyd in his official capacity, the claim is duplicative of the *Monell* claim against BPD because "an official capacity claim . . . is a claim against a government entity of which an agent is an officer." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).  "Where . . . a plaintiff sues both individual officers in their official capacities under § 1983, and a municipality under *Monell*, for following a particular 'policy or custom' that resulted in alleged constitutional harm, the claims are duplicative." *Cottman v. Balt. Police Dep't*, No. SAG-21-837, 2022 U.S. Dist. LEXIS 7637, at *17 (D. Md. Jan. 13, 2022).

Here, the allegations in Count X assert a *Monell* claim against BPD and an official capacity claim against Lloyd based on the same alleged conduct.  Therefore, Count X will be dismissed as duplicative to the extent Plaintiff brings an official capacity claim under § 1983 against Lloyd in his official capacity as a BPD officer.

### 3.      Section 1983 against Lloyd in his Individual Capacity

In Count IX, Plaintiff asserts an action under 42 U.S.C. § 1983 against Lloyd in his individual capacity for Fourth and Fourteenth Amendment violations.  (ECF No. 29 ¶¶ 140–145.)

Lloyd does not dispute that Plaintiff adequately alleges a Fourth Amendment-based § 1983 claim, but contends that the Fourteenth Amendment-based § 1983 claim contained in Count IX should be dismissed.  (ECF No. 39 at 21-22, arguing that "Plaintiff's claim arises, if at all, under the Fourth Amendment.")  In response, Plaintiff does not address whether the Fourth and Fourteenth Amendment claims "arise from" the Fourth Amendment; rather, Plaintiff asserts that Lloyd's conduct violated the Fourteenth Amendment.  (ECF No. 41 at 30.)

"In order for an individual to be liable under § 1983, it must be 'affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights." *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985) (quoting *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977)).  "[T]o establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  Plaintiff alleges, and Defendants do not dispute, that Lloyd was at all times relevant to the Amended Complaint acting in his capacity as a Sergeant with the BPD Homicide Unit.  (ECF No. 29 ¶ 7.)  Plaintiff also specifically alleges that Lloyd was at all relevant times acting within scope of his employment. *Id.*

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. CONST. AMEND. IV.  The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. CONST. AMEND. XIV, § 1.  A liberty interest "denotes not merely freedom from bodily restraint" but also

the right to "engage in any of the common occupations of life." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 572 (1972) (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)).

"The Due Process Clause does not constitute a catch-all provision that provides a remedy whenever a state actor causes harm." *Evans v. Chalmers*, 703 F.3d 636, 647 n.2 (4th Cir. 2012). "Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994).

Plaintiff alleges that he "had a protected property and liberty interest in his freedom, his ability to exercise his free will and domain over his person, to bodily integrity and personal security, and his ability to be free from unlawful and unwelcome seizure by the police." (ECF No. 29 ¶ 143.)  Plaintiff's due process claim contained in Count IX is rooted in the allegation that Plaintiff has "the right to be free from unreasonable seizures," and is thus more properly analyzed under the Fourth Amendment.  (ECF No. 29 ¶ 142.)  "Since the Fourth Amendment provides a constitutional protection against unlawful searches and seizures, [Plaintiff] has no substantive due process claim against [Lloyd]."  *Schloss v. Lewis*, No. CV JFM-15-1938, 2016 WL 1451246, at *9 (D. Md. Apr. 12, 2016), *aff'd sub nom. Schloss v. Abey*, 691 F. App'x 710 (4th Cir. 2017) (citing *Rich v. United States*, 158 F. Supp. 2d 619, 625 (D. Md. 2001) (holding that a plaintiff could not simultaneously assert § 1983 claims for Fourth Amendment violations and substantive due process violations arising out of the same search); and *Lytes v. Smith*, 11 F. Supp. 3d 527, 538 (D.S.C.) (holding the same) *aff'd*, 585 F. App'x 51 (4th Cir. 2014)).

Accordingly, Plaintiff fails to state a claim for relief on the basis of a Fourteenth Amendment due process violation under 42 U.S.C. § 1983.  The Lloyd Motion will be granted as

to Count IX only as to recovery for violation of the Fourteenth Amendment.  Count IX's Fourth Amendment claim will proceed as against Lloyd.

### D.    State Law Claims (Counts V, VI, VII, VIII)

#### 1.    Conspiracy (Count V)

In Count V, Plaintiff asserts a civil conspiracy claim against the City, BPD, and the Officer Defendants.  (ECF No. 29 ¶¶ 118–120.)  As set forth above, Plaintiff has voluntarily dismissed his claims against the City and Plaintiff's claim for civil conspiracy against BPD fails by reason of sovereign immunity.  Therefore, the court will assess whether Count V can proceed as against the Officer Defendants.

"Under Maryland law, civil conspiracy is defined as the 'combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff.'"  *Marshall v. James B. Nutter & Co.*, 758 F.3d 537, 541 (4th Cir. 2014) (quoting *Hoffman v. Stamper,* 385 Md. 1, 24 (2005)).  "Civil conspiracy requires proof of three elements: '1) A confederation of two or more persons by agreement or understanding; 2) [S]ome unlawful or tortious act done in furtherance of the conspiracy or use of unlawful or tortious means to accomplish an act not in itself illegal; and 3) Actual legal damage resulting to the plaintiff.'"  *Windesheim v. Larocca*, 443 Md. 312, 347 (2015) (quoting *Lloyd v. Gen. Motors Corp.,* 397 Md. 108, 154 (2007)).  "An unlawful act connotes a tort, breach of contract or other actionable wrong."  *Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*, 905 F. Supp. 2d 675, 696 (D. Md. 2012).

#### a.        *Intracorporate Conspiracy Doctrine*

The Officer Defendants argue that the intracorporate conspiracy doctrine bars Plaintiff's civil conspiracy claim.  (ECF No. 37-1 at 5; ECF No. 38-1 at 6; ECF No. 39 at 11-15.)  In response, Plaintiff argues exceptions to the doctrine apply to permit the claim to proceed.  (ECF No. 43 at 13-21; ECF No. 42 at 16-24; ECF No. 41 at 14-21.)

"The intracorporate conspiracy doctrine maintains that because the acts of corporate agents are legally attributed to the corporation itself, 'a conspiracy between a corporation and its agents, acting within the scope of their employment, is a legal impossibility.'"  *Blades of Green, Inc. v. Go Green Lawn & Pest, LLC.*, 598 F. Supp. 3d 348, 357-58 (D. Md. 2022) (quoting *Marmott v. Maryland Lumber Co.*, 807 F.2d 1180, 1184 (4th Cir. 1986)).  "Subject to certain exceptions, the intracorporate conspiracy doctrine '[i]n essence, [ ] means that a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves.'"  *Id.* (quoting *Baltimore-Washington Tel. Co. v. Hot Leads Co., LLC*, 584 F. Supp. 2d 736, 744 (D. Md. 2008).

Two exceptions apply:

> (1) when a corporate officer has an "independent personal stake" in achieving the illegal objectives of the corporation, *Greenville Publ'g Co. v. Daily Reflector, Inc.*, 496 F.2d 391, 399 (4th Cir. 1974), and (2) when the agent's acts are unauthorized. *Buschi v. Kirven*, 775 F.2d 1240, 1252-53 (4th Cir. 1985).

*Bumgardner v. Taylor*, No. RDB-18-1438, 2019 WL 1411059, at *6 (D. Md. Mar. 28, 2019).

"For the independent personal stake exception to apply, 'a conspirator must possess a personal interest independent and 'wholly separable' from the interests of the corporation.'"  *Id.* at *6 (quoting *Walters v. McMahen*, 795 F. Supp. 2d 350, 359 (D. Md. 2011)).  Plaintiff argues that the personal stake exception applies because Diaz, Taylor, and Larbi engaged in the alleged

misconduct because they wanted to ingratiate themselves to their supervisor, Lloyd.  (ECF No. 42 at 20; ECF No. 43 at 16; ECF No. 29 ¶¶ 31, 33.)  Plaintiff further argues that the personal stake exception applies to Lloyd because he wanted Plaintiff's money.  (ECF No. 41 at 17.)

The Amended Complaint alleges that each of the Officer Defendants had a "dual motive."  As for Lloyd, the Amended Complaint alleges he acted "to serve the interests of the BPD" and to "extort money from Plaintiff"; and Larbi, Taylor, and Diaz acted to "ingratiate themselves to their supervisor" and "to enforce the laws" and "provide back up" to fellow officers.  (ECF No. 29 ¶¶ 30-33.)  Read liberally and in the light post favorable to Plaintiff, the Amended Complaint is at odds with the personal stake exception as applied to Diaz, Taylor, and Larbi.  A "dual motive" to enforce the law and advance one's law enforcement career does not articulate a personal interest "wholly separable" from the interests of the BPD; to the contrary, enforcement of the law and retention and advancement of officers is squarely aligned with the interests of the BPD.  That Diaz, Taylor, and Larbi might have sought personal career benefits or advancement by currying favor with Lloyd as their supervisor does not articulate an exception to the doctrine.  The court agrees, however, that Lloyd's personal stake is of a different sort – personal financial gain.  And while the court agrees with Plaintiff that such an allegation is sufficient at this stage, *Greenville Pub. Co. v. Daily Reflector, Inc*., 496 F.2d. 391 (4th Cir. 1974), absent viable co-conspirator defendants, the claim cannot stand based on the personal stake exception.  In other words, the personal stake exception only applies to Lloyd, and there is no such thing as a conspiracy of one.

Plaintiff also argues that the second intracorporate conspiracy doctrine exception applies to allow the claim to proceed.  Specifically, Plaintiff urges that whether the Defendant Officers' bad acts were "authorized" is a question for the jury and should not be resolved at this stage.  In the sections of the Amended Complaint describing the "Parties" and "Facts Common to All

Counts," Plaintiff alleges that, "at all relevant times," the Officer Defendants "worked for the Baltimore Police Department", were "employed" with the BPD, "were on duty", and acted in their "official capacity[ies]" and "within the scope of [their] employment." (ECF No. 29 ¶¶ 6-10, 18.) In the civil conspiracy count specifically, Plaintiff "adopts and incorporates by reference the allegations contained in all of the paragraphs of" the Amended Complaint, and alleges that the Officer Defendants engaged in the alleged misconduct "as agents of the Baltimore Police Department and the Mayor and City Council of Baltimore." Specifically, Plaintiff's Count V asserts: "Defendant Lloyd, Defendant Diaz, Defendant Taylor, and Defendant Larbi – acting as agents of the Baltimore Police Department and the Mayor and City Council of Baltimore – entered into an agreement to extort Plaintiff, convert money from Plaintiff, kidnap Plaintiff, engage in misconduct in office, falsely arrest Plaintiff, falsely imprison Plaintiff, and violate Plaintiff's rights under Article 24 and 26 of the Maryland Declaration of Rights." *Id.* ¶ 118. And, Plaintiff's *Monell* claim is premised on BPD's alleged unconstitutional policies and practices that encouraged the Defendants Officers to act as alleged and generally promoted their misconduct.

The Amended Complaint cannot be read plausibly to allege that the Officer Defendants acted within the scope of their employment or, in the alternative, for purposes of civil conspiracy liability, outside the scope of their employment and, thus, viewed as "unauthorized." *See Burgess v. Baltimore Police Dep't*, No. CV RDB-15-0834, 2016 WL 795975, at *11 (D. Md. Mar. 1, 2016) (noting that the officers' actions in furtherance of the alleged conspiracy were authorized by BPD especially where the plaintiff's "*Monell* claim hinges on his assertion that the BPD perpetuated certain unconstitutional policies and practices"); *Williams v. Mayor, Baltimore City*, No. WMN-14-1125, 2014 WL 5707563, at *6 (D. Md. Nov. 4, 2014) (applying intracorporate conspiracy doctrine where the plaintiff alleged that the defendants "were at all times pertinent acting within

the scope of their employment as agents, servants, and employees of the BPD") (citation omitted);
*Kangalee v. Baltimore City Police Dep't*, No. CIV.A. RDB-12-01566, 2012 WL 5457231, at *7
(D. Md. Nov. 7, 2012) (applying intracorporate conspiracy doctrine where the plaintiff alleged that
"at all times relevant to this matter, [the officer] acted under color of law"); *Bumgardner v. Taylor*,
No. CV RDB-18-1438, 2019 WL 1411059, at *6 (D. Md. Mar. 28, 2019) (finding that second
exception does not apply because the plaintiff alleged that the defendant officers were acting within
the scope of their employment); *see also Fidelity First Home Mortgage Co. v. Williams,* 208 Md.
App. 180 (2012) (noting that acts can be at once within the scope of employment and agency, and
yet undertaken in a forbidden manner or expressly forbidden by law).

Accordingly, the intracorporate conspiracy doctrine applies and Plaintiff's civil conspiracy
claim is barred.[15]

### b.    *Separate Cause of Action / Failure to State a Claim*

For purposes of completeness, the court will address Lloyd, Taylor, and Larbi's remaining
arguments that conspiracy is not a stand-alone tort.  (ECF No. 38-1 at 4-5; ECF No. 39 at 9-10.)

As discussed, civil conspiracy requires "three elements: '1) A confederation of two or more
persons by agreement or understanding; 2) [S]ome unlawful or tortious act done in furtherance of
the conspiracy or use of unlawful or tortious means to accomplish an act not in itself illegal; and
3) Actual legal damage resulting to the plaintiff.'"  *Windesheim*, 443 Md. at 347.

---

[15] Plaintiff also argues that the intracorporate conspiracy doctrine does not apply where a plaintiff alleges a civil
conspiracy based on or arising from criminal conduct.  (ECF No. 41 at 17.)  The court acknowledges that other district
courts have applied this principle, however, no controlling Fourth Circuit authority has been cited in support of this
additional exception.  Although the court agrees, in principal, that the criminal conduct exception to the doctrine may
apply to the alleged facts before the court, Count V will be dismissed for the reasons set forth in Section D.1.b, *infra*.
Should Plaintiff elect to amend his pleading, application of the criminal conduct exception can be addressed following
additional briefing should a dispositive motion be filed.

Here, apart from the intracorporate conspiracy doctrine application, the claim as pled is deficient.  To begin, civil conspiracy is not a stand-alone tort.[16]  *See Manikhi v. Mass Transit Admin.*, 360 Md. 333, 360 n.6 (2000) (noting that it is "improper pleading to allege . . . conspiracy in [a] separate count[.]"); *Lilly v. Balt. Police Dep't*, No. CV RDB-22-2752, 2023 WL 6216605, at *15 (D. Md. Sept. 25, 2023) ("Civil conspiracy is not an independent cause of action under Maryland law, and a defendant's liability for civil conspiracy depends entirely on its liability for a substantive tort.") (quoting *Hejirika v. Md. Div. of Corr.*, 264 F. Supp. 2d 341, 346–47 (D. Md. 2003) and *Fare Deals, Ltd. v. World Choice Travel.Com, Inc.*, 180 F. Supp. 2d 678, 692 (D. Md. 2001)) (internal quotation marks omitted)).  The court understands Plaintiff to intend to plead that the Officer Defendants conspired to engage in civil wrongs to injure Plaintiff, and that they in fact did so, however, as demonstrated by the above-cited authority, for each tort a plaintiff alleges defendants to have conspired to commit, a complaint shall plead one claim of civil conspiracy with respect to each alleged tort.  Further, inasmuch as Plaintiff's claim of conversion fails to survive the Lloyd Motion on substantive grounds, *see* Section III.D.4, *infra*, the claim of conspiracy to engage in conversion so too fails.  Moreover, civil conspiracy to engage in "misconduct in office" and to "extort" are not cognizable claims for this Plaintiff.

---

[16] For this reason, courts routinely dismiss a plaintiff's civil conspiracy claim as an independent cause of action.  *See Chubb & Son v. C & C Complete Servs., LLC*, 919 F. Supp. 2d 666, 679 (D. Md. 2013) (explaining that dismissal of the plaintiffs' civil conspiracy claim "does not preclude [the plaintiffs] from relying on a civil conspiracy theory to hold [individual defendants] liable if [the plaintiffs] manage to state a cognizable fraud claim"); *Lee v. Queen Anne's Cnty. Off. of Sheriff*, No. CIV.A. RDB-13-672, 2014 WL 476233, at *16, n.33 (D. Md. Feb. 5, 2014) (dismissing civil conspiracy claim because "under Maryland law, there is no separate tort for civil conspiracy" and noting that such dismissal does not prevent the plaintiff from relying on conspiracy theory to extend liability to co-conspirators later); *Woods v. Stewart Title Guar. Co.*, No. CIV. CCB-06-0705, 2006 WL 2135518, at *4, n.4 (D. Md. July 28, 2006) (dismissing conspiracy claim and noting that the plaintiff is not precluded "from relying on a conspiracy theory to argue that [the defendant] is liable for the actions of its alleged co-conspirators").

###### 2.      *Aiding and Abetting (Count VI)*

In Count VI, Plaintiff asserts an aiding and abetting claim against Diaz, Taylor, and Larbi. (ECF No. 29 ¶¶ 122–127.)  Taylor and Larbi argue that aiding and abetting is not a valid cause of action.  (ECF No. 38-1 at 7.)  Diaz argues that the aiding and abetting claim is barred by the intracorporate conspiracy doctrine.  (ECF No. 37-1 at 6.)

Under Maryland law, to state a claim for aiding and abetting, a plaintiff must allege: the existence of "underlying tortious activity;" *Alleco Inc. v. Harry & Jeanette Weinberg Found.*, 340 Md. 176, 201 (1995), and that "the aider and abettor 'knowingly and substantially assist[ed] the principal violation.'" *Sutton v. FedFirst Fin. Corp.*, 226 Md. App. 46, 91 (2015) (quoting *Holmes v. Young*, 885 P.2d 305, 308 (Colo. Ct. App. 1994)).  Like conspiracy, it is "improper pleading to allege aiding and abetting and conspiracy in separate counts of the amended complaint, as if they were causes of action independent of an underlying tort." *Manikhi*, 360 Md. at 359 n.6.  "The underlying tort is the cause of action that should be set forth in a separate count." *Id.*  "The alleged aiders, abettors, and co-conspirators are simply additional parties jointly liable with the principal perpetrator." *Id.*

In the instant case, Plaintiff alleges:

> Detective Troy Taylor ran Plaintiff's driver's license and license plate through law enforcement databases to aid Defendant Lloyd. Detective Troy Taylor had access to these law enforcement databases solely as a result of his employment as a sworn officer with the Baltimore City Police Department. Detective Taylor discovered that Plaintiff had a suspended driver's license, and he provided Defendant Lloyd with this information.

> Defendant Lloyd informed Plaintiff that his license was suspended because of child support. Defendant Lloyd told Plaintiff that he would arrest him unless he got his money back that Defendant Lloyd had already paid Plaintiff.

Defendant Lloyd acted out of dual motives. While Defendant had personal motivations to extort money from Plaintiff, Defendant Lloyd also acted, in part, to serve the interests of the Baltimore Police Department and Mayor and City Council of Baltimore by discovering that Plaintiff's license was suspended and identifying a potential infraction of Maryland law governing the lawful operation of vehicles.

Juan Diaz, a Baltimore City police officer, approached Defendant and Plaintiff while they were at the back of the house. His gun and badge was visible. Detective Diaz told Plaintiff, "all you have to do is give his money back." Defendant Diaz made these comments – while armed with a firearm and under the implicit threat of arrest – in an attempt to intimidate and implicitly coerce Plaintiff to give Defendant Lloyd money. Defendant Diaz also acted out of dual motive. While Defendant Diaz was motivated to ingratiate himself to Defendant Lloyd, Defendant Lloyd also acted out of dual motives and sought to serve the interests of Baltimore Police Department by providing back up to the fellow members of his squad.

Defendant Lloyd then called Manuel Larbi and Troy Taylor, the Baltimore City police officers waiting in the van, and asked them to take Plaintiff downtown because he was driving on a suspended license. The officers approached Plaintiff with their badges and guns visible. Plaintiff feared for his safety.

Defendants Larbi and Taylor acted out of dual motives to both ingratiate themselves to their supervisor, Defendant Lloyd, and also to enforce laws governing operation of a motor vehicle with a valid license and enforcing the child support laws.

…

Defendant Taylor aided Defendant Lloyd by searching for the nearest bank location so Defendant Lloyd could transport him to that location to get Plaintiff's money.

…

Defendant Lloyd, Defendant Diaz, Defendant Larbi, and Defendant Taylor were on duty as sworn law enforcement officers with the Baltimore City Police Department when this incident took place. The individual defendants provided material aid, support, and assistance in Lloyd's extortion of Plaintiff by assisting him and providing the perception that Defendant Lloyd was acting with the power, authority, and the force of law conferred by the Baltimore

Police Department. At no time did Defendant Diaz, Defendant Larbi, and Defendant Taylor intervene to aid Plaintiff and stop Defendant Lloyd's extortion and other torts committed against Plaintiff.

…

Defendant Lloyd engaged in independent tortious conduct when he extorted Plaintiff, converted money from Plaintiff, kidnapped Plaintiff, engaged in misconduct in office, falsely arrested Plaintiff, falsely imprisoned Plaintiff, intentionally inflicted emotional distress, and violated Plaintiff's rights under Article 24 and 26 of the Maryland Declaration of Rights.

Defendant Juan Diaz gave substantial assistance, aid, and encouragement to Defendant Lloyd's tortious and unlawful conduct by being physically present to intimidate Plaintiff, by being armed with a firearm, and by telling Plaintiff the patio was not worth $7000.00 for the purposes of communicating to Plaintiff that he needed to give Lloyd money back, and by telling Plaintiff "all you have to do is give his money back" to avoid being arrested and having his car towed.

Defendant Todd Taylor gave substantial assistance, aid, and encouragement to Defendant Lloyd's tortious and unlawful conduct by being physically present to intimidate Plaintiff, by being armed with a firearm, by running Plaintiff's license plate through a law enforcement database without any legitimate law enforcement purpose, by running Plaintiff's driver's license through a law enforcement database without any legitimate law enforcement purpose, and by searching for a location of the Navy Federal Credit Union so that Defendant Lloyd could transport Plaintiff to the bank to convert Plaintiff's money.

Defendant Manuel Larbi gave substantial assistance, aid, and encouragement to Defendant Lloyd's tortious and unlawful conduct by being physically present to intimidate Plaintiff, by being armed with a firearm, and by running a search of Plaintiff on two law enforcement databases any legitimate law enforcement purpose.

Defendants Diaz, Taylor, and Larbi had actual knowledge of Defendant Lloyd's wrongful conduct and their role in furthering this conduct.

(ECF No. 29 ¶¶ 28-33, 35, 42, 122–25.)

The court agrees that the intracorporate conspiracy doctrine casts a dark shadow on Count VI.  Given the juncture of the case, however, and the lack of controlling authority, the court finds that in the light most favorable to Plaintiff, the better course of action is to revisit this issue with more robust briefing at the Rule 56 stage.  Therefore, the court will not dismiss Count VI on the basis that it is barred by the intracorporate conspiracy doctrine.  While Plaintiff's effort to recover under the theory of aiding and abetting survives at least conceptually, Count VI in its current form suffers from the same maladies that beset Count V.  Therefore, Count VI will be dismissed – not on the basis that Plaintiff is not entitled to proceed on aiding and abetting theory – but because Count VI as plead impermissibly lumps all of the alleged tortious acts together as one. Accordingly, Plaintiff may elect to amend his pleading to cure these deficiencies.

### 3.    *Intentional Infliction of Emotional Distress (Count VII)*

In Count VII, Plaintiff asserts an intentional infliction of emotional distress claim against Lloyd.  (ECF No. 29 ¶¶ 129–32.)  Lloyd argues that Plaintiff's intentional infliction of emotional distress claim should be dismissed because Plaintiff's allegations are conclusory and insufficient to state a claim.  (ECF No. 39 at 17.)

"To state a prima facie case of intentional infliction of emotional distress, a plaintiff must allege facts showing that: (1) the conduct in question was intentional or reckless; (2) the conduct was extreme and outrageous; (3) there was a causal connection between the conduct and the emotional distress; and (4) the emotional distress was severe."  *Rubino v. New Acton Mobile Indus., LLC*, 44 F. Supp. 3d 616, 624 (D. Md. 2014) (citing *Harris v. Jones*, 281 Md. 560, 566 (1977)). "When attempting to make such a showing, plaintiffs need to plead with specificity, as reciting 'in conclusory form the bare elements of an intentional infliction of emotional distress claim' will not do."  *Lilly v. Balt. Police Dep't*, No. CV RDB-22-2752, 2023 WL 6216605, at *18 (D. Md. Sept.

25, 2023) (quoting *Vance v. CHF Int'l*, 914 F. Supp. 2d 669, 683 (D. Md. 2012)).  "To be actionable, the conduct relied upon 'must strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung.'" *Farasat v. Paulikas*, 32 F. Supp. 2d 244, 248 (D. Md. 1997) (quoting *Hamilton v. Ford Motor Credit Co.*, 66 Md. App. 46, 59–60, *cert. denied*, 306 Md. 118 (1986)).

Lloyd directs the court's attention to *Farasat v. Paulikas*.  (ECF No. 39 at 16; citing 32 F. Supp. 2d 244 (D. Md. 1997)).  There, in support of the IIED claim, the plaintiff alleged that the defendant "committed acts of sexual harassment against plaintiff, including grabbing him and hugging him as well as grabbing his arm and rubbing herself against him; . . . made verbal statements designed to sexually harass plaintiff;  . . . stated that she would sleep with plaintiff ahead of her boyfriend; and . . . told plaintiff's girlfriend, when she called him at work, that plaintiff was 'under the table and would not be done for a while.'"  32 F. Supp. 2d 244, 247 (D. Md. 1997).  In granting the defendants' motion to dismiss Count III, the court reasoned:

> Following its review of the applicable Maryland cases, this Court has concluded that the claim asserted by plaintiff in Count III must be dismissed. The tort of intentional infliction of emotional distress is rarely viable. *Bagwell v. Peninsula Regional Medical Center*, 106 Md. App. 470, 514, 665 A.2d 297 (1995), *cert. denied*, 341 Md. 172, 669 A.2d 1360 (1996). Maryland courts have established a high standard of culpability before conduct can be considered "extreme and outrageous." *Harris*, 281 Md. at 566–572, 380 A.2d 611. Plaintiff has failed to allege conduct on the part of defendant Paulikas which was "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Id.* 281 Md. at 567, 380 A.2d 611. To be actionable, the conduct relied upon "must strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung." *Hamilton v. Ford Motor Credit Co.*, 66 Md. App. 46, 59–60, 502 A.2d 1057, cert. denied, 306 Md. 118, 507 A.2d 631 (1986). Particularly in an employment situation, a plaintiff faces insuperable hurdles in attempting to plead a proper claim of intentional infliction of emotional distress. *See Kentucky Fried Chicken Nat'l*

> *Management Co. v. Weathersby*, 326 Md. 663, 666–69, 607 A.2d 8
> (1992). The allegations relied upon here do not satisfy the
> requirement of the Maryland cases that a plaintiff must specifically
> plead extreme and outrageous conduct.
>
> Moreover, plaintiff has done no more than conclusorily allege that
> he suffered "severe emotional distress" and "mental anguish." To
> proceed further with a claim like this one, a plaintiff must allege "'a
> severely disabling emotional response', so acute that 'no reasonable
> man could be expected to endure it.'" *Leese v. Baltimore County*, 64
> Md. App. 442, 471, 497 A.2d 159, *cert. denied*, 305 Md. 106, 501
> A.2d 845 (1985). The allegations of Count III do not satisfy this
> requirement. There are no allegations in the amended complaint that
> plaintiff was ever treated by a physician for his mental anguish, that
> he was ever hospitalized because of a severely disabling emotional
> condition, that he lost sleep or weight, or that he was unable
> subsequently to live a normal life. Plaintiff's reliance on *Young v.
> Hartford Accident & Indemnity Co.*, 303 Md. 182, 492 A.2d 1270
> (1985), is misplaced. In that case, the plaintiff was forced to undergo
> repeated medical examinations, was required to receive psychiatric
> care, was totally disabled as a result of her psychosis, attempted
> suicide, and was admitted to a psychiatric hospital. No such
> allegations are present in this case.

*Id.* at 247–48.

Plaintiff's claim for intentional infliction of emotional distress must be based on specific

facts. *See Farasat, supra; see also Lee v. Queen Anne's Cnty. Off. of Sheriff*, No. CIV.A. RDB-

13-672, 2014 WL 476233, at *16 (D. Md. Feb. 5, 2014) (dismissing IIED claim where the plaintiff

"alleges that he struggles sleeping, avoids socializing, and sees a psychiatrist for anxiety and

depression," and "only vaguely alluded to the intensity and the duration of his distress") (citation

omitted); *McDaniel v. Maryland*, No. CIV.A. RDB-10-00189, 2010 WL 3260007, at *9 (D. Md.

Aug. 18, 2010) (dismissing IIED claim where the plaintiff "has not set forth 'specific facts

regarding the nature, intensity, and duration of the alleged emotional trauma'") (quoting *Chin v.

Wilhelm*, 2006 U.S. Dist. LEXIS 13101, at *31 (D. Md. Mar. 24, 2006)). Moreover, the court

notes that "the tort of intentional infliction of emotional distress is rarely viable." *See Farasat, supra.*

Construed in the light most favorable to Plaintiff (and taken as true), the Amended Complaint plausibly alleges an intentional infliction of emotional distress claim.  In contrast to *Farasat*, Plaintiff here alleges that he was unable subsequently to live a normal life – *i.e.,* he had to stop working in Baltimore for a period of time, the location of the vast majority of his work. (ECF No. 29 ¶ 132.)  Moreover, Lloyd's position as a law enforcement officer "enhances the alleged extreme and outrageous character of [his] conduct, which 'may arise from [his] abuse of a position, or relation with another person, which gives him actual or apparent authority over him, or power to affect his interests.'"  *McPherson v. Balt. Police Dep't*, 494 F. Supp. 3d 269, 286 (D. Md. 2020) (quoting *Harris v. Jones*, 281 Md. 560, 569 (1977)).  Plaintiff also alleges that Lloyd used his authority as an officer to threaten him and extort money from him, which resulted in emotional distress. (ECF No. 29 ¶¶ 52, 129–132.)  While Plaintiff "will have a high bar to clear as the litigation proceeds," *McPherson*, 494 F. Supp. 3d at 286, at this stage, the court declines to dismiss the intentional infliction of emotional distress claim.  *See McPherson v. Balt. Police Dep't*, 494 F. Supp. 3d 269, 286 (D. Md. 2020) (declining to dismiss the plaintiff's IIED claim where the defendants "are alleged to have used their authority as officers to falsify evidence of Plaintiffs' participation in a homicide, resulting in decades of wrongful imprisonment and the attendant emotional distress").  Accordingly, the Lloyd Motion will be denied as to Count VII.

### 4.    *Conversion  (Count VIII)*

In Count VIII, Plaintiff alleges a conversion claim against Lloyd.  (ECF No. 29 ¶¶ 134–38.)  Lloyd argues that the conversion claim should be dismissed because the monies are not subject to conversion.  (ECF No. 39 at 18.)

Under Maryland law, "[c]onversion is an intentional tort, consisting of two elements, a physical act combined with a certain state of mind." *Darcars Motors of Silver Spring, Inc. v. Borzym*, 379 Md. 249, 261 (2004). "The physical act can be summarized as 'any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it.'" *Id.* (citations omitted). "This act of ownership for conversion can occur either by initially acquiring the property or by retaining it longer than the rightful possessor permits." *Id.* at 261–62.

Generally, "monies are intangible and, therefore, not subject to a claim for conversion." *Allied Inv. Corp. v. Jasen*, 354 Md. 547, 564 (1999). "An exception exists, however, when a plaintiff can allege that the defendant converted specific segregated or identifiable funds." *Id.* In The exception may apply where the funds "have been or should have been segregated for a particular purpose or that have been wrongfully obtained or retained or diverted in an identifiable transaction." *Id.* (citation omitted). In *Nash v. Montgomery County, Maryland*, this court explained:

> Where the defendant "commingles [the funds] with other monies," however, "the money 'loses its specific identity and may no longer be the subject of a conversion action.'" *Gibbons v. Bank of Am. Corp.*, No. JFM-08-3511, 2012 WL 94569, at *9 (D. Md. Jan. 11, 2012) (quoting *Simmons v. Lennon*, 139 Md. App. 15, 33, 773 A.2d 1064, 1075 (2001)); *see also John B. Parsons Home, LLC v. John B. Parsons Found.*, 217 Md. App. 39, 61, 90 A.3d 534, 547 (2014) ("[W]hen funds are co-mingled, the monies lose their 'separateness' and, therefore, are not subject to a claim of conversion."). Essentially, courts applying Maryland law have distinguished between claims seeking return of the actual, identical money, and those seeking a specific amount of money. *See, e.g., Hobbs v. St. Martin*, 198 F. Supp. 3d 530, 539 (D. Md. 2016), *order vacated on other grounds sub nom. Hobbs v. Martin*, No. JKB-16-749, 2017 WL 105675 (D. Md. Jan. 11, 2017) ("More fundamentally, Plaintiff's conversion claim fails because he has not alleged that he was entitled to—or had any expectation of—restoration of the particular funds that he agreed to lend Hagen." (emphasis original));

> *G&D Furniture Holdings, Inc. v. SunTrust Bank*, No. TDC-16-2020, 2016 WL 7441607, at *7 (D. Md. Dec. 22, 2016) (dismissing conversion claim where the plaintiff "asserted the intentional withdrawal of, and failure to return, a specific dollar amount," but not "that the allegedly converted funds were segregated, identifiable, or kept separate in any way"); *Durm v. Am. Honda Fin. Corp.*, No. WDQ-13-0223, 2013 WL 6490309, at *6 (D. Md. Dec. 9, 2013) ("The complaint does not seek the return of the exact funds Durm paid to Honda, but instead seeks damages . . . . Durm basically alleges that . . . Honda owes him a specific amount of money.").

No. GJH-20-1138, 2021 WL 1222874, at *8 (D. Md. Mar. 31, 2021).

Here, Lloyd argues that because Plaintiff fails to allege that the money paid to him "was deposited into a specially designated account, separate from his other funds, or that Mr. Lloyd had an obligation to return the specific money deposited," Plaintiff's conversion claim fails. (ECF No. 39 at 18.) The court agrees.

Plaintiff alleges:

> When Plaintiff arrived at the bank, he exited the car and entered the bank to request a cashier's check made out to Defendant for $3,500. The bank teller asked for Plaintiff's identification but his driver's license was in the possession of Defendant Lloyd. Plaintiff had to go outside to retrieve his driver's license from Defendant Lloyd to obtain the cashier's check. Plaintiff then gave the check to Defendant.

> Defendant Lloyd would later deposit this check. Defendant Lloyd did not return this stolen money to Plaintiff.

> …

> Defendant Lloyd converted Plaintiff's property when Defendant Lloyd drove Plaintiff to a bank under the threat of arrest and criminal charges and forced him to withdraw money to give to Defendant Lloyd.

> Defendant Lloyd acted with the intention to take the money because he drove Plaintiff to a bank for purposes of him forcing Plaintiff to withdraw the money for Defendant Lloyd.

42

> Defendant Lloyd acted without permission or justification when he used the powers of his position as a sworn law enforcement officer to compel Plaintiff to give him money.
>
> Defendant Lloyd exercised dominion over the property when he extorted money from Plaintiff.
>
> Plaintiff suffered damages as a result of Defendant Lloyd's conversion of Plaintiff's money.

(ECF No. 29 ¶¶ 39–40, 134–37.)

Plaintiff fails to assert "that the allegedly converted funds were segregated, identifiable, or kept separate in any way." *See G&D Furniture Holdings, Inc. v. SunTrust Bank*, No. CV TDC-16-2020, 2016 WL 7441607, at *7 (D. Md. Dec. 22, 2016) (dismissing conversion claim where the plaintiff "has not alleged that [the defendant] removed identifiable funds for a specific purpose, that [the defendant] maintained the withdrawn funds in a segregated account, that [the defendant] did not commingle the funds without separate accounting, or that [the defendant] was specifically required to return the specific funds"); *Nash v. Montgomery Cnty., Md.*, No. GJH-20-1138, 2021 WL 1222874, at *8 (D. Md. Mar. 31, 2021) (dismissing conversion claim where the plaintiff failed to allege "any facts suggesting that these funds have been held in a segregated account or otherwise held apart"). Ultimately, Plaintiff "does not seek the return of the exact funds" he paid to Lloyd, rather he seeks damages and alleges that Lloyd "owes him a specific amount of money." *Durm v. Am. Honda Fin. Corp.*, No. WDQ-13-0223, 2013 WL 6490309, at *6 (D. Md. Dec. 9, 2013). Accordingly, the Lloyd Motion will be granted as to Count VIII.[17]

---

[17] Plaintiff's reliance on *Sage Title Group, LLC v. Roman* is misplaced. As Plaintiff notes, in that case, the Supreme Court of Maryland noted that "there was sufficient evidence presented to the trier of fact for it to determine that [the defendant's] funds had been converted on the basis that the funds remained specifically identifiable in the escrow account and were not commingled as alleged." 455 Md. 188, 207–208 (2017). In the instant case, Plaintiff does not allege that the funds were not commingled.

IV.    **CONCLUSION**

For the reasons set forth herein, by separate order, the City Motion (ECF No. 35) will be granted.  The BPD Motion (ECF No. 36) will be granted in part and denied in part as follows: granted as to Counts III, IV, V, XI, XII, and X (failure to train and supervisory liability); and denied as to Count X (condonation theory).  The Diaz Motion (ECF No. 37) will be granted.  The Taylor Motion (ECF No. 38) will be granted.  The Lloyd Motion (ECF No. 39) will be granted in part and denied in part as follows: granted as to Counts V, VIII, IX (Fourteenth Amendment only) and X; and denied in all other respects.

_____/S/_____
Julie R. Rubin
United States District Judge

March 28, 2024