**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

LUIS ALFONSO TORRES
HERNANDEZ,

     *Plaintiff*,

     v.                        Civil No.: 1:23-cv-01016-JRR

JAMES ABRAHAM LLOYD, *et al.*,

     *Defendants*.

## <u>MEMORANDUM OPINION</u>

Pending before the court is Defendant/Cross Claimant Plaintiff Baltimore Police Department's ("BPD") Motion for Partial Summary Judgment at ECF No. 94 (the "Motion"). The court has reviewed all papers. Notwithstanding Plaintiff's request, no hearing is necessary. Local Rule 105.6 (D. Md. 2025). For the reasons that follow, by accompanying order, BPD's Motion will be granted in part and denied in part.

## I.   BACKGROUND

Plaintiff brings the instant action for violations of Maryland law (common law and constitutional) and the U.S. Constitution for actions arising from events that occurred on June 25, 2020, when BPD homicide detective, Defendant James Abraham Lloyd, allegedly extorted and kidnapped Plaintiff and engaged in misconduct in office. (ECF No. 29.) Following motions practice, the following counts and Defendants remain:

> **Count I**: False Imprisonment against Defendant Lloyd;
> **Count II**: False Arrest against Defendant Lloyd;
> **Count III**: Violation of Article 24 of the Maryland Declaration of Rights against Defendant Lloyd;
> **Count IV**: Violation of Article 26 of the Maryland Declaration of Rights against Defendant Lloyd;
> **Counts VII**: Intentional Infliction of Emotional Distress against Defendant Lloyd;

**Count IX**: Violation of 42 U.S.C. § 1983 (Fourth Amendment) against Defendant Lloyd; and

**Count X**: Violation of 42 U.S.C. § 1983 (*Monell* Condonation Theory) against Defendant BPD.[1]

(ECF Nos. 29, 58, 60.)

With its answer, BPD filed a Crossclaim for declaratory relief against Lloyd, asking the court to declare that Lloyd's actions at issue in this action 1) "were committed outside of the scope of his employment as a BPD law enforcement officer and in pursuit of said officer's private and personal interests" (Count I); and 2) "were not committed under the 'color of law'" (Count II). (ECF No. 62 ¶¶ 1–10.)  BPD filed the instant Motion for summary judgment on its Crossclaim. (ECF No. 94.)  Both Plaintiff and Lloyd oppose the Motion.  (ECF Nos. 99, 100.)

## II.    UNDISPUTED FACTS[2]

### A.  Defendant Lloyd's Employment with BPD

Defendant Lloyd was a Sergeant within BPD's Homicide Unit in 2020.[3]  (Lloyd Dep. Tr., ECF No. 94-3 at 17:21–18: 14.)  At all relevant times, Lloyd has resided in Baltimore County, Maryland.  *Id.* at 5:11–14; 39:10–12.  In his role as Sergeant, Lloyd supervised Manual Larbi and Troy Taylor; Juan Diaz was also a detective in the Homicide Unit, but was not supervised by Lloyd.  *Id.* at 19:14–20:17.  Lloyd's responsibilities as a homicide detective included "secur[ing] witnesses and persons of interest" related to homicide investigations on behalf of BPD's Homicide Unit.  *Id.* at 21:6–13; 226:11–16.  Lloyd's responsibilities occasionally required action outside of

---

[1] The court granted BPD's motion to bifurcate and stay discovery of Plaintiff's Count X § 1983 claim against it.  (ECF Nos. 75, 76.)

[2] Unless otherwise indicated, the parties agree the following facts are undisputed for purposes of the Motion.  (ECF No. 94-1 at pp. 3–8; ECF No. 99 at pp. 3–10; ECF No. 100 at p. 1 n.1.)  While Lloyd seemingly disputes making certain statements discussed herein, *see, e.g.*, Lloyd Dep. Tr., ECF No. 94-3 at 150:1–11; 150:19–151:3; 117:2–4; 166:16–18, he nonetheless adopts them as undisputed for the purpose of resolving the instant Motion.  (ECF No. 100 at p. 1 n.1.)

[3] Like BPD, the court will refer to Lloyd generally as a "homicide detective."  *See, e.g.*, ECF No. 94-1 at pp. 12, 20, 22.)

2

Baltimore City, including when an investigation overlapped with another district or county or when requested by another department. *Id.* at 22:21–25:13. If Lloyd's investigation in a given case called for him to take certain actions in another county, his practice was to notify a point person in that county. *Id.* at 25:14–8. On or before June 25, 2020, Plaintiff was not a suspect in any crime Lloyd was investigating. *Id.* at 226:7–10.

At issue here, BPD Policy 302 includes relevant rules and regulations governing its police officers. It provides in relevant part:

> 20. Members are sworn in as peace officers of Baltimore City and, as such, are considered to be on-duty or ready for duty at all times. Failure to stop and perform the necessary police duties while off-duty or on leave shall be considered neglect of duty, unless a verified excuse is accepted by a supervisor.
>
> 20.1. Necessary police duties, while off-duty may include, but are not necessarily limited to:
>
> > 20.1.1. Immediately notifying the responsible law enforcement agency,
> >
> > 20.1.2. Causing such notification, or
> >
> > 20.1.3. Taking direct police action.
>
> 20.2. Off-duty members, both inside and outside of the City limits, are to first consider whether the appropriate action can be effected by the on-duty members of the responsible law enforcement agency.
>
> > 20.2.1. Members should become directly involved only after due consideration of the gravity of the situation, their present physical and mental ability to act in an on-duty capacity and of their possible liability, along with that of the Department and the City of Baltimore.
> >
> > 20.2.2. Members have no powers of arrest outside the City of Baltimore or properties owned by the City of Baltimore, other than those of common citizens.

> 20.2.3. Whenever members assume their official role and take direct police action, they are governed by all policies, rules and regulations applicable to on-duty members.

(Policy 302, ECF No. 99-5 § 20.)

### B.  The Patio Project

Lloyd met Plaintiff Luis Alfonso Torres Hernandez in May 2020, when Lloyd observed Plaintiff working on a patio at a nearby house in Baltimore County.  (Lloyd Dep. Tr., ECF No. 94-3 at 32:5–33:9.)  Plaintiff worked as a home contractor at the time, running his own business, Signum Designs.  (BPD's Torres Dep. Tr., ECF No. 94-4 at 24:14–18.)  Lloyd communicated with Plaintiff via his personal cell phone about a potential job to construct a brick paver patio at his personal residence, *see* Lloyd Dep. Tr., ECF No. 94-3 at 33:1–2, 16–20; 34:19–21; 38:6–21; Plaintiff quoted Lloyd a price of $7,000 for the job and the two agreed to an installment plan, with a payment of $2,335.73 to start work, *see id.* at 37:2–5; 44:7–45:15.  *See also* BPD Ex. 3, ECF No. 94-5 at DEF LLOYD 000898–899.  Plaintiff's workers started on the project at Lloyd's home on June 12, 2020.  (Lloyd Dep. Tr., ECF No. 94-3 at 45:21–46:4.)  When the workers completed the job later that same day, Lloyd paid Plaintiff the final check after confirming the work had been completed to his satisfaction.  *Id.* at 46:7–47:18.

Less than a week later, on June 18, 2020, upon noticing that the pavers had loosened, Lloyd became dissatisfied and texted Plaintiff to request that he fix the issue.  *Id.* at 53:18–54:12; 60:1–14; 62:11–14.  *See also* BPD Ex. 3, ECF No. 94-5 at DEF LLOYD 000904.  On June 19, 2020, Plaintiff returned to Lloyd's home to inspect the patio and discuss the issue with Lloyd's fiancé.  (Lloyd Dep. Tr., ECF No. 94-3 at 64:14–65:13; BPD Ex. 3 at DEF LLOYD 000911–912; Diaz Dep. Tr., ECF No. 99-2 at 37:8–18.)  Detective Diaz was also present at Lloyd's request.  (Diaz Dep. Tr., ECF No. 99-2 at 35:4–7.)  Lloyd's fiancé relayed to Lloyd that Plaintiff wanted additional

payment to fix the job.  (Lloyd Dep. Tr., ECF No. 94-3 at 65:6–16; BPD Ex. 3 at DEF LLOYD 000911–912.)

Prior to the eventual repair on June 25, 2020, Lloyd instructed Larbi to conduct criminal records searches of Plaintiff using governmental or law enforcement databases "[t]o determine his identity for the purpose if there's any criminal activity [that] may be afoot," such as "alleged fraud or theft of services or not paying workers."  (Larbi Dep. Tr., ECF No. 99-3 at 27:9–17; Lloyd Dep. Tr., ECF No. 94-3 at 111:16–113:19.)  Lloyd's purpose in doing so did not "pertain[] to a particular assignment that [he had in] Baltimore City."  (Lloyd Dep. Tr., ECF No. 94-3 at 112:10–13.)

On June 25, 2020, Plaintiff went to Lloyd's house (located in Baltimore County) for the repair.  *See id.* at 122:2–12.  After locating a suspect in Baltimore City and returning him to the Homicide Unit with Larbi and Taylor, Lloyd left work to "take care of some stuff with [a] contractor."  (Larbi Dep. Tr., ECF No. 99-3 at 32:3–21.)  Lloyd left wearing his normal work attire—a regular civilian suit—with his BPD-issued firearm secured in an ankle holster and his badge in his wallet.  (Lloyd Dep. Tr., ECF No. 94-3 at 105:17–106:12.)  Lloyd did not seek permission to leave his post and was not performing a task directed to him by BPD.  *Id.* at 226:3– 10.  Relatedly, Baltimore County Police Department ("BCPD") did not request his presence, nor did Lloyd notify BCPD regarding any investigation or concern.  *Id.* at 227:7–14.  Lloyd asked Larbi, Taylor, and Diaz to come to his residence in Baltimore County.  *Id.* at 122:2–125:4.  Like Lloyd, all the detectives were on duty when this occurred.  (Larbi Dep. Tr., ECF No. 99-3 at 30:1– 33:10; 53:7–14; Diaz Dep. Tr., ECF No. 99-2 at 61:20–68:17.)  Lloyd purportedly asked Diaz to go to his residence so that he could translate for him,[4] and asked Taylor to come look at the patio

---

[4] Plaintiff speaks both English and Spanish.  (Diaz Dep. Tr., ECF No. 99-2 at 36:6–8; 45:7–20.)  The translation Diaz refers to here appears to be in reference to translation for a Mr. Morales, one of Plaintiff's workers.  (Diaz Dep. Tr., ECF No. 99-2 at 61:20–62:62:2, 66:15–19; Lloyd Dep. Tr., ECF No. 94-3 at 63:10–12.)

due to his own prior construction experience.  (Diaz Dep. Tr., ECF No. 99-2 at 61:20–68:17; Lloyd Dep. Tr., ECF No. 94-3 at 122:6–18; 123:6–12.)  Larbi did not understand their presence there to be related to a criminal investigation at Lloyd's residence.  (Larbi Dep. Tr., ECF No. 99-3 at 53:19–54:1.)

Upon exiting his vehicle and walking up to Plaintiff, Lloyd told Plaintiff that they "ha[d] problems" and asked where his "contract" was.  (Pl.'s Torres Hernandez ("Torres") Dep. Tr., ECF No. 99-4 at 134:1–137:16.)    Lloyd then asked Plaintiff for his driver's license purportedly to "verify who he was."  (Lloyd Dep. Tr., ECF No. 94-3 at 128:14–21.)  Lloyd testified: "If I would have needed to contact someone to make a report, I would have." *Id.* at 88:12–21.  When Plaintiff asked why Lloyd wanted his driver's license, Lloyd "showed [him] his badge" and responded, "because of this."  (BPD's Torres Dep. Tr., ECF No. 94-4 at 100:1–3.)  It was then that Plaintiff learned Lloyd was a police officer.  *Id.* at 100:4–6.  Lloyd contends he advised Plaintiff he was a law enforcement officer because it is "customary."  (Lloyd Dep. Tr., ECF No. 94-3 at 89:14–16.) Lloyd asked Taylor to run Plaintiff's driver's license through their dashboard criminal records search, and Taylor learned and informed Lloyd that Plaintiff's license was suspended. (Taylor Dep. Tr., ECF No. 94-6 at 35:5–21.)  Lloyd purportedly informed Plaintiff that his driver's license was suspended for a "[l]aw enforcement" reason.  (Lloyd Dep. Tr., ECF No. 94-3 at 134:19–135:11.)  Lloyd told Plaintiff, "you know what, you give me my money and I give you freedom."[5] (Pl.'s Torres Dep. Tr., ECF No. 99-4 at 143:3–7.)  Lloyd then asked two of the other officers, "what can we do when somebody drives on an expired license,[6] can we arrest them and take them

---

[5] Plaintiff's papers suggest that Lloyd made this statement after he asked the two other officers what action they can take on an expired license and while Plaintiff was in Lloyd's vehicle.  (ECF No. 99 at pp. 8, 24.)  The court's review of the cited deposition transcript, however, supports that this statement was made prior to Lloyd's conversation with the two officers and while Plaintiff was still in Lloyd's backyard.  (Pl.'s Torres Dep. Tr., ECF No. 99-4 at 143:3–144:19) (describing this conversation as occurring while they "were in the backyard" and prior to Lloyd calling over the "other" two officers).

[6] Plaintiff's license was suspended, not expired.  (Lloyd Dep. Tr., ECF No. 94-3 at 134:7–135:11.)

downtown?" to which another officer responded, "yeah." (Pl.'s Torres Dep. Tr., ECF No. 99-4 at 143:15–19.)

Lloyd asked Plaintiff for $3,500 to resolve the dispute regarding the patio work. (Lloyd Dep. Tr., ECF No. 94-3 at 146:1–14; Pl.'s Torres Dep. Tr., ECF No. 99-4 at 155:1–10.) Lloyd also asked Plaintiff about his bank; Plaintiff responded that he used Navy Federal Credit Union ("Navy Federal"). (Pl.'s Torres Dep. Tr., ECF No. 99-4 at 144:10–14.) Lloyd told Plaintiff, "come with me, we're going to Navy Federal." *Id.* at 150:16–19. Plaintiff recollects that he asked Lloyd, "can I drive my car?" and Lloyd responded, "no, come in my car." (Lloyd Dep. Tr., ECF No. 94-3 at 149:13–21; Pl.'s Torres Dep. Tr., ECF No. 99-4 at 144:19–21.) Lloyd then drove Plaintiff from Lloyd's residence in Baltimore County to a Navy Federal location in Glen Burnie, Maryland. (Lloyd Dep. Tr., ECF No. 94-3 at 150:12–15.) While driving to Navy Federal Credit Union, Plaintiff told Lloyd, "Mr. Lloyd, I don't want no problems with you at all." In response, Lloyd gestured to a wooded area and said, "you know what would be a problem? . . . If I take you into those woods right now, you would be in big problems. So you're not in problems right now. If you see me taking you there, then you would be in a lot of problems."[7] (Pl.'s Torres Dep. Tr., ECF No. 99-4 at 151:13–18.)

Upon arriving at Navy Federal, Plaintiff withdrew the money from his account and returned to Lloyd with a cashier's check in the amount of $3,500. *Id.* at 153:11–155:15. Lloyd then gave Plaintiff a receipt for the money and drove Plaintiff back to Lloyd's residence. (Lloyd Dep. Tr., ECF No. 94-3 at 159:3–6; 217:12–219:1.) After returning to Lloyd's residence, Plaintiff asked to

---

[7] Plaintiff asserts this statement was "to suggest [Lloyd] would kill [Plaintiff] or engage in other acts of violence if Plaintiff did not withdraw money from Navy Federal Credit Union." (ECF No. 99 at pp. 9–10.) As far as the court can discern, the cited portion of the deposition transcript does not reflect that this was Plaintiff's understanding of the statement. (Pl.'s Torres Dep. Tr., ECF No. 99-4 at 151, 214.) Nonetheless, the court can infer from Plaintiff's testimony that he construed the statement as a threat.

go to his next job site. *Id*. at 155:18–156:16. Lloyd told him he could leave, gave Plaintiff his card with his phone number on it, and told Plaintiff to "be careful" and call him "[i]f there's any problems." *Id*. at T.156:14–157: 15. Plaintiff then left Lloyd's residence. *Id*. at 157:16–17. Lloyd then deposited the $3,500 check into his personal bank account. *Id.* at 159:7–11. Lloyd did not contemporaneously report or document anything regarding Plaintiff or the events on June 25, 2020, to BPD or BCPD. *See id*. at 227:15–228:4; 228:21–229:6.

### C. Subsequent Criminal Investigation of Lloyd

Following a report by Plaintiff and investigation by BCDP, Lloyd was arrested and charged with extortion, kidnapping, and misconduct in office in the Circuit Court for Baltimore County. *See* Lloyd Dep. Tr., ECF No. 94-3 at 223:2–6. On July 18, 2022, Lloyd pled guilty to misconduct in office pursuant to an *Alford* plea[8] and was sentenced to three (3) years with all but one (1) year suspended, and ordered to pay restitution in the amount of $3,500. *Id.* at 112:10–17. *See also* BPD Ex. 3 at DEF LLOYD 000023.

### III.  LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

---

[8] "An *Alford* plea . . . 'lies somewhere between a plea of guilty and a plea of *nolo contendere*.'" *Bishop v. State*, 417 Md. 1, 19 (2010) (quoting *Rudman v. Md. State Bd. of Physicians,* 414 Md. 243, 260 (2010)). "Drawing its name from *North Carolina v. Alford,* [400 U.S. 25 (1970)], such a plea is 'a guilty plea containing a protestation of innocence.'" *Id.* (quoting *Marshall v. State,* 346 Md. 186, 189 n.2 (1997)).

When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a factfinder for resolution at trial. *Id.* at 249. Trial courts in the Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)). A party "need[s] to present more than their own unsupported speculation and conclusory allegations to survive." *Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 780 (4th Cir. 2023). Further, "[u]nder this standard, 'the mere existence of a scintilla of evidence' in favor of the non-movant's position is insufficient to withstand the summary judgment motion." *Wai Man Tom v. Hospitality Ventures, LLC*, 980 F.2d 1027, 1037 (4th Cir. 2020) (quoting *Anderson*, 477 U.S. at 252).

In undertaking this inquiry, the court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007). The court "must not weigh evidence or make credibility determinations." *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *see also Jacobs v. N.C. Adin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015) (explaining that the trial court may not make credibility determinations at the summary judgment stage). Indeed, it is the function of the factfinder to resolve factual disputes, including issues of witness credibility. *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014).

## IV.    ANALYSIS

BPD brings the instant Motion for summary judgment on its crossclaims that Lloyd's actions toward Plaintiff on June 25, 2020, were outside the scope of his employment as a BPD

homicide detective and were not performed under color of state law.  (ECF No. 94.)  Accordingly, BPD argues it is not liable under the Local Government Tort Claims Act ("LGTCA") for any judgment against Lloyd and in favor of Plaintiff in relation to the conduct at issue in this action. *Id.*  Both Plaintiff and Lloyd oppose the Motion, with Lloyd adopting Plaintiff's arguments in opposition.  (ECF Nos. 99, 100.)

### A.  Crossclaim Count I: Scope of Employment

BPD first argues that Lloyd's conduct was outside the scope of his employment as a Sergeant with BPD.  (ECF No. 94-1 at pp. 10–20.)

The LGTCA provides that "a local government shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government."  MD. CODE ANN., CTS. & JUD. PROC. ("CJP") § 5-303(b)(1).  It "requires each county to provide limited indemnity to county employees for non-malicious tortious acts or omissions committed in the employees' scope of employment."  *Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 378 (D. Md. 2011).  The LGTCA specifically identifies BPD as one such local government entity.  CJP § 5-301(d)(21).  "[T]he LGTCA conditions the local government's liability on the employee acting within the 'scope of employment.'"  *Baltimore City Police Dep't v. Esteppe*, 247 Md. App. 476, 523 (2020), *aff'd,* 476 Md. 3 (2021) ("*Esteppe II*") (citing CJP § 5-303(b)(1)).  Under Maryland law, a two-pronged test—the *Sawyer* test—is applied to determine "whether an employee acted within the scope of employment," with the first prong being "whether the employee's actions 'were in furtherance of the employer's business[,]'" and the second prong being "whether the employer 'authorized' the employee's actions."  *Id.* (quoting *Sawyer v. Humphries*, 322 Md. 247, 255 (1991)); *see also Baltimore City Police Dep't v. Potts*, 468 Md. 265, 271 (2020).  "In applying this test, there are few, if any, absolutes."  *Sawyer*,

10

322 Md. at 255.  The court "must engage in a case-specific analysis—*i.e.*, resolve the issue on a fact-intensive, case-by-case basis." *Potts*, 468 Md. at 306.

On the first prong, "the question is 'not whether the employee's actions were done while prosecuting the employer's business, but whether they were done by the employee in furtherance thereof." *Id.* at 288 (citation modified) (quoting *Sawyer*, 322 Md. at 255).  This consideration turns on whether an officer's actions were "at least partially motivated by a purpose to serve the Department," or instead whether the officer was "acting to protect [his] own interests." *Id.* at p. 306 (quoting *Sawyer*, 322 Md. at 255–57).

On the second prong, "to be considered authorized by the employer, the employee's actions must be at least incidental to those authorized by the employer, as determined by consideration of 10 factors outlined in [*Potts* and *Sawyer*]." *Esteppe v. Baltimore City Police Dep't*, 476 Md. 3, 11 (2021) ("*Esteppe III*").  The 10 factors are as follows:

> (a) whether or not the actions are commonly done by such employees; (b) the time, place, and purpose of the actions; (c) the previous relations between the employer and the employee; (d) the extent to which the business of the [employer] is apportioned between different employees; (e) whether the actions are outside the enterprise of the employer or, if within the enterprise, have not been entrusted to any employee; (f) whether or not the employer has reason to expect that such actions will be done; (g) the similarity in quality of the actions that were done to the actions that were authorized by the employer; (h) whether or not the instrumentality by which the harm is done has been furnished by the employer to the employee; (i) the extent of departure from the normal method of accomplishing an authorized result; and (j) whether or not the actions are seriously criminal.

*Potts*, 468 Md. at 289–90 (citation modified) (quoting *Sawyer*, 322 Md. at 256). Ultimately, an employee's conduct "must be of the kind that the employee is employed to perform," during a period "not unreasonably disconnected from the authorized period of employment," in a locality

11

that is not "unreasonably distant" from the authorized area, and that is "actuated, at least in part, by a purpose to serve the employer." *Potts*, 468 Md. at 289 (quoting *Sawyer*, 322 Md. at 255).

Foreseeability is important to the issue of scope of employment. *Clark v. Prince George's Cnty.*, 211 Md. App. 548, 573 (2013). "An employee's acts are outside the scope of employment where they are personal, where they represent a departure from a purpose of furthering the employer's business, or where the employee is acting to protect the employee's own interests." *Esteppe III*, 476 Md. at 11 (citing *Sawyer* and *Potts supra*). Where an employee's conduct "'is unprovoked, highly unusual, and quite outrageous,' courts tend to hold 'that this in itself is sufficient to indicate that the motive was a purely personal one' and the conduct outside the scope of employment." *Sawyer*, 322 Md. at 257. Such language, however, "does not establish a hard-and-fast rule." *Potts*, 468 Md. at 312. "Instead, the language is an observation about the type of conduct that Courts have been inclined to determine to be outside of the scope of employment." *Id.* "The illegality or tortious nature of the employee's actions alone does not establish that the conduct was outside the scope of employment." *Id.* at 318.

Maryland case law provides guidance on what constitutes conduct within the scope of employment. *Id.* at 271. For example, "[a]t one end of that spectrum is allegedly tortious conduct . . . based on its patently personal and outrageous nature," and at the other end of the spectrum "is conduct that unquestionably qualifies as police action." *Cf. Prince George's Cnty. v. Morales*, 230 Md. App. 699, 716–17 (2016) (discussing cases in the excessive force context). *See also, e.g.*, *Potts*, 468 Md. at 306 ("[I]t is evident that where an officer sexually assaults a suspect in custody, the officer does not act within the scope of employment, and where an officer uses excessive force, the officer may be acting within the scope of employment. [] Between these opposite ends of the spectrum, in Maryland, the constant is that the test enunciated by this Court

in Sawyer is accepted as the framework for analyzing whether an officer acted within the scope of employment.") (citation omitted).

The court thus considers the foregoing against the undisputed facts here.  On the first prong, the court considers whether Lloyd's actions on June 25, 2020, were in furtherance of BPD's business, meaning "at least partially motivated by a purpose to serve the Department." *Potts*, 468 Md. at 288, 306, *supra*.  The undisputed facts here leave but one inference: that Lloyd's actions on June 25, 2020, were in service of his own personal interests, as opposed to any service to BPD. *Id.* at 306.  The undisputed facts are that Lloyd engaged in the challenged conduct to obtain, in essence, a refund based on issues with the patio project Plaintiff completed at Lloyd's personal residence.  While it is true that Lloyd undoubtedly used equipment to which he had access by virtue of his employment with BPD and did so while on duty, this alone is not dispositive, especially where the undisputed evidence does not meaningfully reflect any BPD purpose in his action—action that was well outside his job description and duties, outside of his relevant jurisdiction, and about which he completed no documentation or report.  *See Sawyer*, 322 Md. at 259 ("[W]hether or not tortious conduct occurs during duty hours or the normal period of employment is only one of many considerations in determining whether the conduct is within the scope of employment. Conduct may occur while one is on duty but still be outside of the scope of employment.  In fact, in virtually all of the cases in which this Court has held that an assault by an employee was outside the scope of employment, the assault occurred at a time when the employee was 'on duty.'").

Indeed, the decision of the Appellate Court of Maryland in *Esteppe II* illustrates that a law enforcement officer's use of law enforcement resources does not convert his actions in service of

his own personal interest to action in furtherance of BPD's purpose.[9]  In *Esteppe II,* the trial court

entered "what was, in effect, summary judgment" in favor of the plaintiff on the question of BPD's

liability under the LGTCA, *see id.* at 497–98, 527, finding that the officer's actions were "clearly

within the scope of employment."  The trial court reasoned as follows:

> Executing a search warrant to seize an illegal firearm is exactly the
> type of conduct for which Lewellen was employed. As the search
> was executed whilst Lewellen was on duty, and in a jurisdiction for
> which Lewellen had police powers, the conduct occurred in an
> authorized area. A primary goal of the [Department] in recent years
> is the seizure of illegal firearms and the arrest of those in possession
> of those weapons, and therefore the search, *however motivated*,
> furthered a purpose of Lewellen's master, the [Department].

*Id.* at 522 (emphasis in original).

The intermediate appellate court (later affirmed by the Supreme Court of Maryland) found

this analysis incorrect, however, because it disregarded the officer's "actions as irrelevant in the

---

[9] Plaintiff contends that in *Esteppe v. Baltimore City Police Department*, 476 Md. 3 (2021), the Supreme Court of Maryland ruled that "a jury could find that these crimes acted upon for personal motives could be within the scope of employment." (ECF No. 99 at p. 17.)  This misstates the holding.  The court summarized the matter as follows:

> The intermediate appellate court held that, on the basis of the undisputed facts in
> the record, Mr. Esteppe had failed to satisfy the first prong of the *Sawyer/Potts*
> test – *i.e.*, that Mr. Lewellen's actions were motivated at least in part by a purpose
> to serve the interests of the Police Department. The court observed that the
> evidence in the record supported a conclusion that Mr. Lewellen was acting to
> further his own interests, not the Police Department's. 247 Md. App. at 524-25,
> 236 A.3d 808. The court also noted that, under *Potts*, the fact that Mr. Lewellen
> was exercising the powers of a police officer was not dispositive. *Id.* at 526, 236
> A.3d 808. Because Mr. Esteppe had failed to establish, based on the undisputed
> facts in the record before the trial court, that Mr. Lewellen's actions were
> motivated at least in part to further the Police Department's interests, he was not
> entitled to summary judgment on the issue of scope of employment. *Id*. at 527-
> 28, 236 A.3d 808.
>
> The [Appellate Court of Maryland], noting that the Police Department had not
> filed its own motion for summary judgment, or any other motion that could be
> construed as a motion for summary judgment, declined to address whether the
> record would support summary judgment in favor of the Police Department.

*Id.* at 12.  It then noted: "We further agree that his lack of success on his motion did not necessarily mean that the Police Department – which has not filed a cross-motion of any sort – was so entitled and that remand to the Circuit Court for further proceedings is appropriate."  *Id.* at 14.

14

scope of employment inquiry." *Id.* at 523.   Here, the undisputed evidence is that Lloyd's motives were personal in nature and unrelated to any BPD business. [10]  *See Potts*, 468 Md. at 290 (explaining "an employee's actions are outside the scope of employment where they are 'personal, where they represent a departure from the purpose of furthering the employer's business, or where the employee is acting to protect his or her own interests, even if during normal duty hours and at an authorized locality") (citation modified) (quoting *Sawyer*, 322 Md. at 256–57).

Plaintiff urges the court that *Wolfe v. Anne Arundel County*, 374 Md. 20 (2003) is materially distinguishable, and therefore should not be considered persuasive here.  (ECF No. 99 at p. 19.) While the court agrees with Plaintiff that sexual assault by officers may be distinguishable from other offenses under Maryland law in the context of the scope of employment analysis, *see Potts*, 468 Md. at 306 (noting that, although there are few if any absolutes, the court "agree[s] that it is evident that where an officer sexually assaults a suspect in custody, the officer does not act within the scope of employment"), *Wolfe* is nonetheless is persuasive here.  As is the case here, the circumstances there involved officer conduct—including certain traditional law enforcement actions (*e.g.*, effecting a traffic stop) while on duty but rooted in purely personal motives.  *See* 374 Md. 20, 34 (2003).   The officer's conduct was thus not found to be within the scope of his employment.

Relatedly, the undisputed facts in this case are materially distinguishable from cases where Maryland courts have found an officer's actions were sufficiently motivated by a purpose to serve BPD in satisfaction of the first prong.  The facts here are unlike those in *Potts*, where, although the officers' conduct was illegal, their actions were "at least partially motivated by a purpose to

---

[10] As noted *supra*, the *Esteppe* courts declined to consider whether the police department was entitled to summary judgment where it had not sought summary judgment; this court thus considers the *Esteppe* reasoning for its persuasive value upon the facts here, but notes the distinguishable posture.

serve the Department," there was "no indication that the officers were 'acting to protect [their] own interests,'" and the officers made stops and arrests while on duty in their jurisdiction. *Potts*, 468 Md. 306. *See also, e.g.*, *Shaw v. Meekins*, No. 2182, Sept.term,2022, 2023 WL 7316843, at *1 (App. Ct. Md. Nov. 7, 2023) (finding officer actions within the scope of employment where he was "was performing a legitimate law enforcement function—executing an arrest warrant—when the alleged assault occurred," notwithstanding doing so "in opposition to the employer's express and positive orders"). Here, the undisputed evidence is that Lloyd was not engaging in unlawful tasks in service to BPD; the undisputed facts are that Lloyd acted to address a personal issue that arose when he became dissatisfied with Plaintiff's work.

That Lloyd may now claim to have taken certain actions because he was concerned that Plaintiff may have been engaged in criminal activity does not, as Plaintiff urges, compel a different result. Plaintiff's argument rests on the assertion that a reasonable factfinder could conclude Lloyd's conduct was within the scope of his employment because he was conducting a law enforcement investigation in his role as a BPD officer. (ECF 99 at pp. 8–9, 13–15.) The court is not persuaded. First, notwithstanding any assertion by Lloyd, it is undisputed that Plaintiff was not a suspect or person of interest in any BPD investigation on or before June 25, 2020, and that BCPD did not request Lloyd investigate Plaintiff in its jurisdiction. It is similarly undisputed that BPD did not direct or authorize an investigation of Plaintiff, that any purportedly suspected criminal activity was not within the scope of Lloyd's work as a homicide detective, and that any suspected criminal activity did not occur in the jurisdiction Lloyd served. Lloyd concedes he "had no authority to make an arrest" of Plaintiff,[11] and Lloyd did not contemporaneously document or

---

[11] (Lloyd Dep. Tr., ECF No. 94-3 at 90:4–17.)

16

report his suspicions to the proper (or any) authorities, even after learning Plaintiff was driving with a suspended license.

While Policy 302 may require a law enforcement officer to take action or notify a responsible law enforcement agency in fulfillment of his necessary police duties, the court is not persuaded that creates a genuine dispute of material fact here. Policy 302 plainly does not authorize or contemplate directing an officer to conduct an investigation outside of his jurisdiction without notifying the proper authorities, especially where the suspected unlawful conduct presents no exigent matter or circumstance. Further, Lloyd's actions toward Plaintiff that amounted to alleged extortion and kidnapping can hardly be described as "police action" pursuant to Policy 302. Indeed, contrary to Policy 302, Lloyd took no police action and made no report to the proper authorities upon learning Plaintiff was driving on a suspended license; instead he permitted Plaintiff to proceed on his way and suggested he call him if he encounters any trouble.

No reasonable factfinder could conclude that Lloyd's actions taken on suspicion that Plaintiff may be engaged in unlawful activity in the operation of his business[12] (which Lloyd had hired for his private residence, outside the scope of his work as a homicide detective and outside of BPD jurisdiction) constituted action in furtherance of BPD business. The undisputed material facts give rise to only one reasonable inference—that Lloyd's actions were in service of his own interest, not BPD—his personal dissatisfaction with Plaintiff's work on his private residence, his desire for the work to be fixed, and his desire for a refund for a job he considered poorly done.

Even were the evidence above sufficient to generate a genuine dispute of material fact on the first prong, BPD would nonetheless be entitled to judgment because the factors on the second

---

[12] The court declines to weigh in on Lloyd's credibility as to whether he did or did not in fact harbor such suspicions, as that would be inappropriate on a Rule 56 motion; rather the court accepts as true that a jury may be so persuaded for purposes of this analysis.

prong similarly fail to support an inference that Lloyd's actions were "at least incidental to those authorized by the employer, as determined by consideration of 10 factors outlined in [*Potts* and *Sawyer*]." *Esteppe III*, 476 Md. at 11. These factors again include:

> (a) whether or not the actions are commonly done by such employees; (b) the time, place, and purpose of the actions; (c) the previous relations between the employer and the employee; (d) the extent to which the business of the [employer] is apportioned between different employees; (e) whether the actions are outside the enterprise of the employer or, if within the enterprise, have not been entrusted to any employee; (f) whether or not the employer has reason to expect that such actions will be done; (g) the similarity in quality of the actions that were done to the actions that were authorized by the employer; (h) whether or not the instrumentality by which the harm is done has been furnished by the employer to the employee; (i) the extent of departure from the normal method of accomplishing an authorized result; and (j) whether or not the actions are seriously criminal.

*See Potts*, 468 Md. at 289–90, *supra*.

Consideration of these factors against the undisputed facts in the record leaves but one inference for a reasonable factfinder—Lloyd's actions were not incidental to those authorized by BPD. *See Esteppe II*, 247 Md. App. at 499 ("Where there is no conflict in the evidence relating to the question of whether an employee is acting within the scope of employment and but one inference can be drawn therefrom, the question is one of law for the court.") (citation modified and omitted).

The court first considers whether Lloyd's actions were those "commonly done" by BPD officers and the previous employment relationship between Lloyd and BPD. *See Potts*, 468 Md. at 289, *supra*. The undisputed material facts are that Lloyd's actions were not authorized by BPD or in the scope of his employment. Lloyd's conduct toward Plaintiff—including allegedly threatening, extorting, and kidnapping him to ensure he received a personal refund for a home construction project—is not the type of action officers "were hired to routinely perform"; neither

18

is it conduct typical in the course of BPD's employment of Lloyd.  *See Potts*, 468 Md. at 313.  And while asking someone for his driver's license and running a records check may be common police officer conduct as a general proposition, there is no dispute that was not a part of Lloyd's job assignment, especially outside of BPD's jurisdiction and where the facts do not allow for the reasonable inference or conclusion that a Policy 302-type investigation was underway.

Consideration of the time, place, and purpose of Lloyd's actions offers little persuasive value for Plaintiff or Lloyd.  Although Lloyd was on duty during the challenged actions (favoring a within-the-scope conclusion), it is undisputed he was outside of his jurisdiction, without permission or authorization, and acting with a personal purpose—to correct the issues with the patio at his home.  These facts are materially distinguishable from those in *Potts* where "[t]he misconduct occurred in Baltimore City, which is the Department's jurisdiction," for the purpose of "the Department's routine business of making arrests."  *Potts*, 468 Md. at 313–14, *supra*. Indeed, Lloyd admittedly had no authority to arrest Plaintiff (and never advised appropriate law enforcement with authority to do so).  On the whole, this factor favors (although not overwhelmingly) that Lloyd's conduct was outside the scope of his employment.

The extent to which BPD's business is apportioned between different employees and whether Lloyd's actions were outside the enterprise similarly favors that Lloyd's conduct was not authorized by BPD and was thus outside the scope of his employment.  The record evidence is that Lloyd was a homicide detective serving Baltimore City.  He lacked authority to arrest Plaintiff, and any unlawful conduct related to Plaintiff's business was not the typical sort of focus or fodder of Lloyd's work as a homicide detective; and the suspected conduct fell outside his jurisdiction. *See Potts*, 468 Md. at 314–15 (noting that regarding apportionment among employees "[t]he record demonstrates that responsibility for the investigation and prosecution of firearm offenses in

Baltimore City had been entrusted to the Gun Trace Task Force and to the officers in this case and, as such, the factor concerning the extent to which business is apportioned between different employees weighs in favor of concluding that the officers' conduct was authorized"). Any sort of investigation into a personal matter in another jurisdiction, in addition to Lloyd's allegedly criminal conduct toward Plaintiff, was not a task "that [he was] plainly entrusted to perform," nor did the "end result" of Lloyd's conduct appear "to have constituted lawful police activity." *Id.* at 315.

With regard to whether BPD furnished Lloyd with the instrumentality by which the harm was done, the court agrees with Plaintiff that this factor weighs in favor of finding the actions were in the scope of employment. In his actions toward Plaintiff, Lloyd plainly utilized equipment he had access to by virtue of his role as detective, including police databases, his law enforcement vehicle, and his service firearm—indeed he made brazen use of these tools not only to effectuate his ends but to make a show of it for the benefit of Plaintiff.[13]

Finally, consideration of whether or not BPD had reason to expect Lloyd to act in the manner at issue, the qualitative similarity between Lloyd's actions and those authorized by BPD, the extent to which Lloyd's actions departed from normal methods of accomplishing police work, and whether Lloyd's actions were seriously criminal all favor conclusion that Lloyd's conduct fell outside the scope of employment. As the court has oft-repeated, Lloyd's alleged conduct—misuse of power, extortion, threats, and kidnapping—is certainly not authorized by BPD, certainly departed from normal methods of accomplishing police work, and are seriously criminal. Indeed, that Lloyd was criminal charged with extortion, kidnapping, and misconduct in office, and pled

---

[13] While there is no assertion before this court that Lloyd expressly threatened Plaintiff with his firearm, the court recognizes that Plaintiff observed the firearm on Lloyd's person, which appears to have, at a minimum, caused him concern. (Pl.'s Torres Dep. Tr., ECF No. 99-4 at 135:9–138:5.)

guilty by way of an *Alford* plea to misconduct in office confirms the serious criminal nature of the allegations. The undisputed evidence also reflects no basis for BPD to have expected such behavior.[14] Demanding a contractor provide a partial refund for defective personal home improvement services bears no similarity to authorized BPD activity; nothing in the record provides any basis on which a reasonable factfinder could conclude that BPD should have been aware that Lloyd might do what he is alleged to have done—or anything adjacent to it.

Lloyd's assertion of efforts to investigate his suspicions fair no better. As discussed above, any purported investigation was not within the scope of his work as a homicide detective or his jurisdiction; the undisputed evidence is that such actions were not of the type BPD authorized or expected Lloyd (or any homicide detective) to undertake. Looking at Lloyd's actual actions upon learning of purportedly unlawful activity confirms this result; instead of reporting Plaintiff's driving on a suspended license, Lloyd instead sent Plaintiff on his way to continue to drive on a suspended license (seemingly offering his assistance should Plaintiff face any trouble), and made no report after he had received his partial refund.

Accordingly, eight of the ten factors support that Lloyd's conduct was outside the scope of his employment with BPD; one factor weighs in favor of the opposite conclusion—that his conduct was authorized by BPD and within the scope of his employment; and a final factor is of little persuasive value, but slightly favors that the conduct was outside the scope of employment. "On balance, consideration of the ten factors warrants the conclusion" that Lloyd's misconduct was not "incidental to actions that the Department authorized." *Cf. Potts*, 468 Md. at 318 (concluding, on

---

[14] Plaintiff states, "while there is no indication that BPD had advance notice of Lloyd's conduct, it is also true that this incident involved not only Lloyd, a supervisor, but three additional sworn officers who were at Lloyd's residence during their shifts while on-duty." (ECF No. 99 at p. 16.) It is unclear how the fact that Lloyd called the other detectives to his home on June 25, 2020, for a personal matter should be read to support that BPD had reason to expect Lloyd would act in the alleged unlawful manner.

review of summary judgment rulings, that the defendants' actions were incidental to those of the employer where the majority of factors weighed in favor, two weighed against, and two did not cut either way).

Based on the undisputed facts in the record and the *Sawyer* test, no reasonable factfinder could conclude that Lloyd's actions were in furtherance of BPD's business or authorized or incidental to the actions BPD authorized.[15]  *See id.* at 318.  Instead, the undisputed evidence leaves but one inference—that Lloyd's conduct was "personal," "unprovoked, "highly unusual," "quite outrageous," and in pursuit of protecting his own interests.  *See Sawyer*, 322 Md. at 257 and *Esteppe*, 476 Md. at 11, *supra*.

In view of the foregoing, and because Lloyd's conduct was outside the scope of his employment with BPD as a matter of law, BPD is not liable under the LGTCA for any judgment against him arising from the actions underlying this lawsuit.  *See* MD. CODE. ANN., CTS & JUD. PROC. § 5-303(b)(1).  *See also Brown v. Mayor*, 167 Md. App. 306, 326 (2006) (determining that the official acted outside the scope of his employment, thereby rendering the

---

[15] Maryland case law provides instruction on when summary judgment is appropriate on the scope of employment inquiry.  As the Appellate Court of Maryland explained in *Baltimore City Police Department v. Esteppe*:

> "If there is a material factual dispute as to whether an employee's actions were taken within the scope of employment, the question is one of fact. If there is not, the question is one of law." *Clark v. Prince George's County*, 211 Md. App. 548, 570, 65 A.3d 785 (2013). "Even when the parties' versions of events are in conflict, however, if the facts adduced to show that the defendant was acting within the scope of his employment are not legally sufficient to support such a reasonable finding by the trier of fact, any dispute of fact is not material, as it will not affect the outcome of the case." *Id.* at 570-71, 65 A.3d 785. "Where there is no conflict in the evidence relating to the question [of whether an employee is acting within the scope of employment] and but one inference can be drawn therefrom, the question is one of law for the court." *Id.* at 571, 65 A.3d 785 (alteration in *Clark*) (quoting *Rusnack v. Giant Food*, 26 Md. App. 250, 265, 337 A.2d 445 (1975)) . . . .

*Baltimore City Police Dep't v. Esteppe*, 247 Md. App. 476, 499 (2020), *aff'd,* 476 Md. 3 (2021); *see also I.D. v. Prince George's Cnty.*, No. 1577, Sept.term,2022, 2024 WL 2012330, at *11 (App. Ct. Md. May 7, 2024) (discussing same); *Clark v. Prince George's Cnty.*, 211 Md. App. 548, 570–71 (2013) (discussing same).  *See also Norris v. PNC Bank, N.A.*, No. CV ELH-20-3315, 2022 WL 2193303, at *28 (D. Md. June 16, 2022) (discussing same).

22

LGTCA . . . inapplicable"). The court will therefore grant BPD's Motion as to Count I of its

Crossclaim.[16]

---

[16] Plaintiff argues:

> [E]ven if this Court believed Lloyd's conduct was outside the scope of his employment, the Court should also deny the motion because § 219(2)(d) of the Restatement of Agency (Second) imposes liability on the principal, *i.e.*, the Baltimore Police Department, if "the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation."

(ECF No. 99 at pp. 2, 19–22.)  As an initial matter, the court is not persuaded this argument is properly before the court.  BPD has moved for summary judgment on its crossclaims, including Count I, which seeks a declaration that Lloyd's acted outside the scope of his employment, thus exempting it from municipal liability under the LGTCA. (ECF No. 62 ¶¶ 1–5.)  To the extent Plaintiff contends there is some basis for liability that may arise despite Lloyd's conduct being outside the scope of employment under the LGTCA, that is unpersuasive as speculative, and outside the four corners of BPD's Motion (the only motion before the court).  Further, the court is not persuaded for the reasons detailed in *Baltimore City Police Department v. Esteppe*:

> Courts in other states that have held that government entities can be liable in respondeat superior for tortious acts committed by police officers with purely personal motives generally either: (1) apply different principles of vicarious liability that do not consider whether the tortious acts were committed within the scope of employment, *see, e.g.*, *Sherman v. State Dep't of Pub. Safety*, 190 A.3d 148, 154, 180-81 (Del. 2018) (en banc) (owing to the unique "coercive power that distinguishes [police officers] from most employees," treating vicarious liability for their actions under the principles of § 219 of the Restatement (Second) of Agency, which addresses " 'situations in which a master may be liable for torts of servants acting solely for their own purposes and hence not in the scope of employment' " (quoting Restatement (Second) of Agency § 219 cmt. e (1958))); or (2) apply a test for scope of employment that does not consider the employee's motivation, *see, e.g.*, *Mary M. v. City of Los Angeles*, 54 Cal.3d 202, 285 Cal.Rptr. 99, 814 P.2d 1341, 1349 (1991) (in bank) (in applying California law, not considering employee's motivation in determining whether to extend vicarious liability); *Cox v. Evansville Police Dep't*, 107 N.E.3d 453, 461 (Ind. 2018) (Under Indiana law, "the scope of employment ... may include acts "that the employee commits for self-gratification or self-benefit ...."). In Maryland, however, the LGTCA conditions the local government's liability on the employee acting within the "scope of employment," Cts. & Jud. Proc. § 5-303(b)(1), and the Court of Appeals in *Potts* has just reaffirmed adherence to the *Sawyer* test, 468 Md. at 271, 227 A.3d 186, which provides that, to fall within the scope of employment, a police officer's tortious conduct must be "actuated at least in part by a purpose to serve the [employer]," *id.* at 289, 227 A.3d 186 (quoting *Sawyer*, 322 Md. at 255, 587 A.2d 467).

247 Md. App. 476, 523 (2020), *aff'd,* 476 Md. 3 (2021).

### B. Crossclaim Count II: Color of Law

BPD also urges it is entitled to summary judgment on its claim that Lloyd's conduct was not performed under color of state law.[17] (ECF No. 94-1 at pp. 21–23.) "Section 1983 provides a cause of action against '[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State' deprives someone of a federal constitutional or statutory right." *Lindke v. Freed*, 601 U.S. 187, 194 (2024). Thus, a § 1983 claim is generally comprised of two elements: "(1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a 'person acting under the color of state law.'"[18] *St. Michael's Media, Inc. v. Mayor & City Council of Baltimore*, No. CV ELH-21-2337, 2023 WL 2743361, at *13 (D. Md. Mar. 31, 2023) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019), *as amended* (Jan. 9, 2019) (quoting *West v. Atkins*, 487 U.S. 42, 49 (1988)). It excludes "merely private conduct, no matter how discriminatory or wrongful." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 50 (1999)).

---

[17] Such a conclusion is, BPD contends, a necessary predicate of Plaintiff's Count X *Monell* claim. (ECF No. 62 ₧ 7.) The court need not address the merits of this contention in ruling on the instant Motion.

[18] By way of reminder, the Supreme Court held in *Monell v. Department of Social Services* that Congress intended "municipalities and other local government units to be included among those persons to whom § 1983 applies." 436 U.S. 658, 690 (1978). The Court explained that "[l]ocal governing bodies [] can be sued directly under § 1983 for monetary, declaratory, or injunctive relief, where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* It cannot, however, "be held liable . . . under § 1983 on a respondeat superior theory." *Id.* at 691; *see Burley v. Baltimore Police Dep't*, 422 F. Supp. 3d 986, 1032 (D. Md. 2019) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." (citing *Iqbal*, 556 U.S. at 676)). Instead, municipal liability attaches only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. at 694. Indeed, for *Monell* liability to attach to a municipality, "a plaintiff must show that the municipality's policies were 'the moving force behind a deprivation of federal rights.'" *Washington v. Hous. Auth. of the City of Columbia*, 58 F.4th 170, 182 (4th Cir. 2023).

Assessment of whether someone acted under color of state law "demand[s] that 'the conduct allegedly causing the deprivation of a federal right be fairly attributable to the State.'" *Davison*, 912 F.3d at 679 (quoting *Holly v. Scott*, 434 F.3d 287, 292 (4th Cir. 2006)).

Whether conduct constitutes action under color of state law "is a matter of normative judgment, and the criteria lack rigid simplicity." *Id.* at 679–80 (quoting *Holly*, 434 F.3d at 292). No one factor is "individually dispositive." *Holly*, 434 F.3d at 292 (quoting *Goldstein v. Chestnut Ridge Volunteer Fire Co.,* 218 F.3d 337, 343 (4th Cir. 2000)). "Courts must examine the 'totality of the circumstances,' to determine if the action at issue 'bore a sufficiently close nexus with the State to be fairly treated as that of the State itself.'" *Davison*, 912 F.3d at 680 (first quoting *Holly*, 434 F.3d at 292; then quoting *Rossignol*, 316 F.3d at 525). Further:

> Although no one factor is determinative, [the Fourth Circuit] has held that a defendant's purportedly private actions bear a "sufficiently close nexus" with the State to satisfy Section 1983's color-of-law requirement when the defendant's challenged "actions are linked to events which arose out of his official status." *Id.* at 524. When a defendant's "status" as a public official "enabled [her] to execute [a challenged action] in a manner that private citizens never could have," then the action also is more likely to be treated as attributable to the state. *Id.* at 526 . . . . Likewise, an official's conduct is more likely to amount to state action when it "occurs in the course of performing an actual or apparent duty of his office." *Martinez*, 54 F.3d at 986. And the challenged action of a defendant governmental official is likely to be treated as taken under color of law when the official "use[d] the power and prestige of his state office to damage the plaintiff." *Harris v. Harvey*, 605 F.2d 330, 337 (7th Cir. 1979).

*Id.* at 680.

"Indicia of state authority—such as an officer being on duty, wearing a uniform, or driving a patrol car—are important considerations, although they are not dispositive." *White v. City of Greensboro*, 532 F. Supp. 3d 277, 309 (M.D.N.C. 2021), *on reconsideration in part,* 586 F. Supp. 3d 466 (M.D.N.C. 2022) (citing *Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 872 (4th Cir.

25

1989)). Instead, it is "the nature of the act performed" that is "controlling." *Revene*, 882 F.2d at 872 (citing *Monroe v. Pape,* 365 U.S. 167, 184–87 (1961)). As the Honorable Deborah K. Chasanow of this court has aptly summarized:

> [I]dentifying oneself as a police officer, while not necessarily dispositive, "generally" indicates acting in official capacity. *See McDonough v. Toles*, 476 F.Supp.3d 882, 891 (D.Minn. 2020) ("It is true that, based on all of the facts and circumstances of a case, an officer may be found not to have acted under color of law, even though the officer identified himself as a police officer . . . . But that is the exception, not the rule."). If a police officer's "purportedly private actions are linked to events which arose out of his official status, the nexus between the two can play a role in establishing that he acted under color of state law." *Rossignol*, 316 F.3d at 524. Ultimately, "the nature of the act performed is controlling," and "[t]he act therefore must be carefully scrutinized to determine whether an officer, when either on or off duty, is acting under color of state law." *Revene*, 882 F.2d at 872.

*Nicholson v. Baltimore Police Dep't*, No. CV DKC 20-3146, 2023 WL 4549741, at *3 (D. Md. July 14, 2023).

Of note here, Maryland's intermediate appellate court has previously opined on the relationship between the "scope of employment" analysis and the "color of law" analysis. It rejected assertion that "determination that [an employee] was acting within the scope of employment was necessary for a finding that [the employee] acted under 'color of law.'" *Brown v. Mayor*, 167 Md. App. 306, 321 (2006); *Gray v. Kern*, No. CIV.A. WMN-13-2270, 2014 WL 1344275, at *2 (D. Md. Apr. 3, 2014) (recognizing same). The "scope of employment is not coextensive with the 'color of law' element of a constitutional claim," as the scope of employment analysis "includes only those actions authorized by the employer" and is narrower than the color of law analysis. *Id.* at 321–22 (first citing *Sawyer,* 322 Md. at 255; and then citing *Screws v. United States*, 325 U.S. 91, 111 (1945)).

26

While the court acknowledges this case presents a close call based on its finding on the scope of employment inquiry, and that "the ultimate resolution of whether an actor was . . . functioning under color of law is a question of law for the court," *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 344 n.7 (4th Cir. 2000); *see Nicholson*, 2023 WL 4549741, at *3 (same), the court is not satisfied BPD has met its burden to show it is entitled to judgment as a matter of law that Lloyd's conduct was not under color of state law based on the undisputed facts in the record.[19]  The undisputed record evidence supports an inference that Lloyd exercised power he possessed by virtue of his status as a BPD officer, including use of his badge, his work vehicle, and criminal records databases.  *See Davison*, 912 F.3d at 679, *supra*.  This, combined with the fact that Lloyd was on duty at the time of the incident, supports a conclusion that Lloyd "used the power and prestige of his state office to damage the plaintiff."  *See id.* (citation modified).  The court is thus not persuaded that BPD has met its burden on the Motion to show as a matter of law that Lloyd's actions taken on June 25, 2020, were not performed under color of law.   The court therefore will deny BPD's Motion as to Count II of its Crossclaim.  To be clear, the court makes no findings on this issue; the parties retain their respective rights to present argument on this point again in the future.

## V.    CONCLUSION

For the reasons set forth herein, by separate order, the BPD's Motion will be granted in part and denied in part.

July 27, 2026                                                    /S/

_____
Julie R. Rubin
United States District Judge

---

[19] Notably, BPD does not even reassert any argument related to its color of law claim in its reply in support of its Motion.  (ECF No. 103.)